STATE of Minnesota, City of
Minneapolis, petitioners,
Plaintiffs,

v.

Larry Michael KLAWITTER, et
al., petitioners, Defendants.

No. C6–93–2092.

Supreme Court of Minnesota.

June 30, 1994.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Robert J. Alfton, Minneapolis City Atty., Karen Swedenburg Herland, Asst. City Atty., Teresa L. Froehlke, Asst. City Atty., Minneapolis, for plaintiff.

William R. Kennedy, Hennepin County Public Defender, Ann Remington, Asst. County Public Defender, Julia Inz, Asst. County Public Defender, Minneapolis, for defendants.

John M. Stuart, Minnesota State Public Defender, Scott G. Swanson, Minneapolis, for amicus curiae.

## OPINION

COYNE, Justice.

We granted the parties' joint petition for accelerated review in this case in order to address an important and doubtful certified question: whether and to what extent so-called Drug Recognition Expert (DRE) testimony is admissible in prosecutions for driving while under the influence of a controlled substance.

This case involves the prosecution of 13 individuals for driving while under the influence of a controlled substance. The parties agreed to use the prosecution of one of the defendants, Larry Klawitter, as a test case. The state contends specifically that defendant Klawitter drove while under the influence of marijuana. It seeks to prove this primarily through (a) the testimony by the arresting officer that defendant appeared to be under the influence of a drug, (b) the admission of defendant to the officer that he had smoked two marijuana joints earlier in the day, and (c) the testimony of a state trooper who performed a 12–step examination of defendant following what is called the "Drug Recognition Protocol."

Defendant moved before trial to suppress the trooper's testimony as novel scientific evidence not generally accepted by the scientific community and therefore not admissible under what has become known as the *Frye* rule.[1] After the suppression hearing, at which ten witnesses testified for the state and four witnesses for the defense, the trial court denied the motion to suppress. Specif-

---

1. The rule is named after *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923), which held that scientific evidence "must be sufficiently established to have gained general acceptance in the particular field in which it belongs" before it will be admitted in evidence. On the use of the *Frye* rule in Minnesota, *compare State v. Moore,* 458 N.W.2d 90 (Minn.1990) ("blood splatter" analysis), with *State v. Anderson,* 379 N.W.2d 70 (Minn.1985) (polygraph evidence) *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). The United States Supreme Court overruled *Frye* in *Daubert v. Merrell Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The *Daubert* case is analyzed in *The Supreme Court, 1992 Term–Leading Cases,* 107 Harv.L.Rev. 144, 254 (1993). We express no opinion on the continued validity of the *Frye* rule in Minnesota.

ically, the trial court ruled (1) that one component of the protocol, the visual examination of the defendant's eyes to determine nystagmus and convergence, is subject to and satisfies the *Frye* test and (2) the other components of the protocol are "essentially the same components that are used by police officers in evaluations for alcohol impairment" or are routine examinations that "can be competently performed by a police officer" and therefore are not scientifically new and are not subject to the *Frye* test. The trial court concluded that the trooper may testify concerning the observations made while following the protocol and, based on those observations, may give an opinion on impairment.

With the qualifications set out below, we affirm the trial court's decision denying the defendant's motion to suppress.

This case had its genesis on August 23, 1992, when Officer Sporny of the Minneapolis Police Department stopped defendant after he observed him cross the center line of Central Avenue and nearly hit a concrete median. Sporny noticed that defendant appeared very nervous and his eyes were "bloodshot, watery and glassy." Defendant admitted drinking two cups of gin and smoking two marijuana joints earlier in the day. After giving defendant a preliminary alcohol screening test, which defendant passed, Sporny concluded that defendant was under the influence of a drug and arrested him for driving while under the influence. On the way to the department's chemical testing station, Sporny radioed ahead and asked for a "Drug Recognition Expert."

Trooper Kevin Daly, the "Drug Recognition Expert," met Sporny and defendant at the chemical testing station. Daly had been with the patrol for six years and is a certified emergency medical technician. In 1987 he attended a two-day course in which he learned "standardized field sobriety testing," including "horizontal gaze nystagmus" testing, "one leg stand," and "walk and turn." Then in 1991 he received specialized training in evaluating people suspected of driving while under the influence of a controlled substance. Specifically, he attended a two-part nine-day course, taught by police offi-

cers, on the recognition of deviant eye movements and of irregularities in vital signs exhibited by impaired motorists, and on recognizing the effects of different types of drugs.

The manual used for the first two days—the "pretraining" part of the nine-day course—describes various drugs which might impair driving and their physical effects. The manual explains several field dexterity tests: the "Romberg Balance Test," in which a suspect closes his eyes, tilts his head back, and tries to estimate the passage of 30 seconds; the "walk and turn," in which the suspect attempts to walk a straight line heel-to-toe, turn around and repeat it; the "one leg stand," in which the suspect is asked to balance on one foot; and the "finger-to-nose" test. The manual also explains eye conditions which may be indicative of impairment: "horizontal gaze nystagmus," the rapid involuntary horizontal oscillation of the eyes when attempting to follow a target moved side-to-side; "vertical nystagmus," the inability to smoothly track the up-and-down progress of a stimulus; lack of convergence, the inability to cross eyes to focus on a target directly before the eyes. The manual cautions that the presence or absence of these optical deviations does not necessarily reveal or rule out drug impairment. Trooper Daly later testified that nystagmus "must be very obvious" before he will document it. According to the manual, pupil dilation or constriction also reveals the use of certain drugs. Horizontal nystagmus and the coordination tests, except for the Romberg test, are already used in field sobriety testing. The manual also deals with examining body temperature and blood pressure; some types of drugs elevate vital signs, some kinds of drugs depress them, and some drugs do neither.

An updated 1991 "pretraining" manual describes a 12–step drug recognition protocol: (1) a breath-alcohol test; (2) an interview with the arresting officer; (3) a preliminary medical examination, including taking the suspect's pulse, to determine whether immediate medical attention must precede further investigation; (4) eye examinations, including nystagmus and convergence tests; (5) motor skills tests; (6) an examination of pulse, temperature, and blood pressure; (7) a pupil

measurement under four lighting conditions and an "ingestion examination," checking the suspect's nose and mouth for signs of inhalation or smoking; (8) an "examination for muscle rigidity"; (9) a search for needle marks; (10) questioning of the suspect in which the officer should suggest that the officer knows the suspect has used certain drugs; (11) documentation of the officer's "expert opinion" of what categories[2] of drugs, if any, have impaired the suspect's ability to drive; and (12) a toxicological examination.

The manual for the seven-day leg of the training explains the same principles in greater detail, but also reviews case law up to publication and details the "expected" physiological effects of each type of drug. In the seven-day training the candidates evaluate simulated reports. Officers are tested at each stage of the training and are required to document the results for every step on an evaluation sheet. The training stresses the importance of the evidence: "The chemical test simply cannot prove that the suspect was impaired * * * at the time * * *. It is up to you to prove that, and to prove that the nature of the impairment was consistent with some category or combination of drugs." In addition, the National Highway Transportation and Safety Board promulgates standards for certification and recertification of officers. The Minnesota state director of DRE programs testified that the federal government "sets up a schedule and a course outline that is to be followed." A national DRE officer explained that a DRE must perform four evaluations every two years for recertification.

In order to complete his training, Trooper Daly performed examinations on suspects in the field. "[T]he vast majority" of individuals he tested in training had not been driving a car. Like other drug evaluators, he was required to participate in 12 evaluations, eight as the "prime evaluator," and correctly identify the use of "at least three of the seven drug categories." Evaluators must log all their evaluations to remain certified, and Daly's log shows 50 examinations, including Klawitter, through April 1, 1993.

Trooper Daly first spoke to Sporny and asked "why he felt the suspect was under the influence." At Daly's request, Sporny asked the defendant to perform a breath test, which did not reveal the presence of alcohol. Defendant also agreed to provide a urine sample but apparently was unable to do so. After "rul[ing] out alcohol as the cause of the impairment," Daly gave Klawitter a *Miranda* warning and interrogated him. Klawitter told Daly he had drunk two cups of gin and "was taking * * * marijuana." Daly performed the eye tests and "[o]bserved that there was no horizontal gaze nystagmus present." Daly also observed no vertical nystagmus, but "[l]ack of convergence was present * * *." Daly then took Klawitter's pulse, which was 94, and directed him to perform the dexterity tests. Klawitter performed the walk-and-turn, one-leg balance, and finger-to-nose tests poorly. Daly testified that the pupil dilation test suggested marijuana use. "Heat bumps" on Klawitter's tongue, Daly said, indicated that he had been smoking. Muscle tone was "near normal." Finally, Daly asked questions "relating to drug use, the final step before * * * forming an opinion," and concluded that Klawitter was "under the influence of cannabis" (*i.e.,* marijuana).

On cross-examination, Daly admitted that a number of officers may apply the same evaluation to their certification requirements because each "expert" need primarily evaluate only a small number of suspects. Daly could not identify from his log sheet which suspects he interviewed as the primary officer. Daly conceded that the ultimate opinion also relies on the opinions of others, and when a non-primary evaluator is responsible for recording the results of the tests, his

2. The Drug Evaluation and Classification Program sponsored by the National Highway Traffic Safety Administration recognizes seven drug categories:
   (1) Central nervous system depressants
   (2) Central nervous system stimulants
   (3) Hallucinogens
   (4) Phencyclidine (PCP)
   (5) Narcotic analgesics
   (6) Inhalants
   (7) Cannabis
The program is not intended to identify a specific drug but only to narrow the focus to one or more drug categories.

observations may be mixed with those of the officer responsible for the ultimate opinion. If the suspect has admitted using drugs, as Klawitter did, the evaluator will be "aware prior to doing any drug influence evaluation" that the suspect has made the admission. Defense counsel pointed out that the evaluator's opinion, unless he or she also arrested the suspect, is formed later and "is not an opinion that [the suspect] was under the influence at the time he may have been driving."

Later, Daly asserted that the nystagmus tests are "reliable * * * indicator[s] of impairment by" central nervous system depressants, PCP, and inhalants. He testified that he does not usually perform an examination unless he has "almost rule[d] out alcohol before [he] begin[s] the evaluation." He admitted that his log revealed only one confirmed inhalant opinion, two confirmed nonalcohol depressant cases, and no PCP diagnoses. He was the primary evaluator in six cases from 1991–1993, and the toxicological results corroborated him only three times. Subsequent chemical testing in the 50 cases in which Daly was the examiner "ruled out" Daly's assessment about 14 times.

As we indicated, the state called a number of experts in support of its contention that DRE evidence is scientifically accepted, reliable and admissible. Robert Meyer, a BCA toxicologist, testified at an evidentiary hearing on the motion for a *Frye* hearing. His opinion was that there is "nothing new" about the process described by Daly. Although the training program is new, "they are not using any new technology that has not already been known and/or used by * * * many other organizations." Meyer admitted that a toxicological exam will not always confirm an officer's opinion and that an opinion does "not necessarily" mean impairment. He has read that horizontal gaze nystagmus "is not necessarily reliable" and is the subject of medical and scientific dispute. Although the principles behind the protocol are not new, Meyer conceded, putting it all together in this protocol "may be in some sense [novel]." The trial court ordered a *Frye* hearing to test the admissibility of horizontal gaze nystagmus, vertical gaze nystagmus and the drug recognition protocol.

Sergeant Thomas Page of the Los Angeles Police Department, the "Officer in Charge" of Los Angeles' drug recognition program, testified at the *Frye* hearing. The LAPD, which pioneered the protocol, trained Page as a drug recognition officer. Page described a California study which · indicated that 94% of the time an evaluation correctly discovered the presence of nonalcoholic substances and 79% of the time the drug was correctly identified. Page said that he consults with medical and scientific professionals in his supervision of Los Angeles' program. Page asserted that use of inhalants and hallucinogens could "rarely, if ever, be corroborated" by a toxicology exam and that he has taught numerous medical professionals to recognize drug-induced impairment. Page opined that the 12–step protocol is a separate field of analysis because of its law enforcement focus; he also said, however, that the medical professionals he has spoken with generally accept the protocol. Sergeant Page is of the opinion that the protocol is scientifically reliable as a predictor of drug impairment. He stressed that an opinion of impairment is based on the "totality" of symptoms but that the eye tests are particularly important. "[I]f you cannot reach an opinion of certainty," he said, "you find in favor of * * * the individual." On cross-examination, he admitted that the protocol used in the study was "not exactly the same" as is used currently, and he conceded that a Los Angeles study showed a cocaine detection rate of only 19% and a marijuana detection rate of only 60%.

Dr. Marcelline Burns, a psychologist who has long been associated with the Los Angeles DRE program, evaluated the protocol's physiological accuracy. She testified that horizontal nystagmus is assessed by the failure of the eye to track an object smoothly as it moves from side-to-side, distinct jerking of the eyeball when an object is held farthest from the center of view, and the point at which eye tremors first occur in a subject tracking the object. Alcohol, central nervous system depressants, inhalants, and PCP all may cause nystagmus. Vertical nystagmus,

which occurs when an object is moved up and down before the suspect, reveals high alcohol content or PCP, depressant or inhalant use. Dr. Burns supervised the Los Angeles accuracy study noted by Sergeant Page. She identified the "field" of expertise as law enforcement "and alcohol and drug research" and concluded that experts in the field agree that the protocol is sufficiently reliable. Much of her testimony, however, was directed toward alcohol impairment tests and standards, not drug impairment tests. Based on this foundation, she testified that police officers "are capable of administering and interpreting the results of the HGN [horizontal gaze nystagmus] test." Dr. Burns told the court that medical and psychological experts "almost entirely" led the early development of the DRE protocol in Los Angeles and that the LAPD "sought out people from the medical and scientific communities" to refine the tests. Cross-examination highlighted gaps in the Los Angeles study; Dr. Burns responded that "no study can study everything" and be free from attack. She conceded that in only 48% of the cases studied did the officer correctly identify all of the drugs present. She also admitted that her study did not "address the ability of a DRE to distinguish a user from a nonuser," thus undermining the study's relevance to an officer's determination whether a particular motorist is impaired. The studies typically do not include cases where the DRE concludes that the suspect is not under the influence of drugs. Dr. Burns further agreed that the eye test portions of the protocol "have a heavy subjective component."

Optometrist David Owen Peed discussed the eye movement tests. He has studied pharmacology, which he described as "the science of the biodynamics of drugs." Peed learned the DRE nystagmus tests from the Georgia State Police. He stated that nystagmus occurs naturally in only 4% of the population and that its presence is normally a sign of a problem. Drug-induced nystagmus is more intense and obvious than other forms, such as that caused by a lack of sleep. He agreed with Dr. Burns that alcohol, depressants, inhalants, and PCP may cause nystagmus. Injury or common viruses are other possible causes. The absence of convergence of the eyes on a near point may indicate alcohol, marijuana, PCP, depressant, or inhalant use, but the inability to cross one's eyes may occur naturally in up to 40% of the population. Peed noted that marijuana use causes bloodshot eyes, as can driving, allergies, and common illnesses. The failure of a pupil to dilate may indicate drug use or unrelated damage. Although Peed has seen the nystagmus test performed on actual subjects only three times and although he agreed that head movement may disturb the accuracy of a nystagmus assessment, he concluded that police can reliably apply the test to determine impairment. He does not diagnose or treat drug impairment as part of his practice of optometry, but he had attended both the standardized field sobriety testing school and the DRE course.

Zenon Zuk, M.D., supported Dr. Burns' assertions. Dr. Zuk witnessed 30 to 40 drug impairment evaluations while working for the City of Los Angeles as a jail physician. He described a general medical examination as consisting of an inquiry into history and symptoms, an examination of vital signs, laboratory tests, and diagnosis. He testified that the protocol followed in a DRE evaluation is analogous to the process a medical professional would employ. The instruments and symptomatology matrix used, he said, are "generally accepted in the medical community." Horizontal and vertical nystagmus are "generally accepted * * * as a sign" associated with the intake of depressants, PCP, and inhalants. Lack of convergence, however, may be less reliable in the custodial setting. The four "divided attention" dexterity tests reveal "drug [or] alcohol impairment" because they show the effect on "cerebellar functions * * * [and] changes in the neurochemistry and neurophysiology that may be brought upon by the ingestion of drugs." The coordination tests are typically part of "a comprehensive neurological examination." A vital signs and pupil-dilation exam is also "relevant to detecting drug impairment," although the stress caused by an arrest may elevate vital signs. He contended that the level of impairment detectable by a DRE exam would render an individual unable to drive safely. He said that an evalu-

ator need not be a medical professional, and he described two occasions in which an officer assessed a suspect's drug use more accurately than he did. Dr. Zuk believes the 12–step process "is a trustworthy and reliable method" for evaluating drug impairment.

A forensic toxicologist from Arizona, Eugene Adler, helped develop Arizona's DRE program after attending the course in Los Angeles. Adler said that a blind toxicological exam alone cannot determine drug impairment. "The signs and symptoms [which are the basis for the DRE's evaluation] are already known by the scientific community * * * and in daily use," he said, although he has not "heard that much about * * * some components" outside his DRE training. Adler conducted two Arizona studies, which he considered supportive of the reliability of the DRE protocol. He reported that in 86% of 341 cases studied, the DRE predicted the presence of at least one drug; the evaluator correctly "attributed impairment to a specific drug category" in 75% of 526 cases. The remaining percentage represents cases where the DRE erred or the lab could not confirm drug use. Adler was not aware of any published allegation that the evaluation process is "seriously flawed."

Dr. S.J. Jejurikar of the Minnesota BCA explained the chemical testing of samples from suspects. The lab uses a "Gas Chromatography–Mass Spectrometry" test. He said that "[i]t is very difficult to assess [impairment] solely on the basis of [a] specimen." At the prosecutor's request, he prepared a report of the BCA's analysis of cases in which the officer predicted the presence of a drug. Of 71 cases, the officer predicted the presence of at least one type of drug in 84.5% of the cases and predicted all drugs present in 79.5% of the cases. Minnesota officers identified marijuana presence best, stimulants 66% of the time, depressants 64.3% of the time, and narcotics only 54.5% of the time.

The defense presented four witnesses. Dr. Miles Belgrade, a neurologist, testified that he "would use part of the DRE examination * * * but * * * would not have it organized quite in this fashion." He said that he would interrogate the patient and perform eye examinations, but he would not trust a police officer to perform a nystagmus or muscle rigidity test because even doctors experience problems interpreting these tests, and these symptoms may also be caused by physical conditions. He disputed that the Romberg balance test reliably indicates drug or alcohol use, and he said that "the vital sign assessment is fraught with difficulty * * * [b]ecause there are so many influences on our vital signs, * * * particularly when we are being pulled over." A urine or blood test, he stated, is "the only reliable way to identify what drugs [a person is] taking." A patient using drugs in combination—which the state's witnesses said is common—is "uninterpretable," he opined. Dr. Belgrade has, however, seen neither the training manuals nor observed an evaluation.

Dr. John Morgan, a pharmacology professor in New York, has published articles on drugs and their effects in "30 or 40 different journals." He criticized the studies offered by the state as lacking in adequate control groups and as providing an incentive to distort an officer's accuracy. He reviewed the exhibits offered, including the DRE manuals, and concluded that the protocol "does not provide reliable information" and "has been subject to almost no discussion in any scientific community." He disputed the reliability of pupil dilation or lack of convergence. Like Dr. Belgrade, Dr. Morgan has not witnessed an evaluation.

Dr. Jeffrey Janofsky, a forensic psychiatrist, testified that international medical literature has not discussed the DRE protocol. He complained that the procedure's assessment of impairment, unlike alcohol impairment tests, has not been confirmed under simulated driving conditions. He opined the protocol is not "reliable or valid either for looking at disability or impairment," or "for [identifying the] presence or absence" of drugs. Because they confirm the presence of drugs only in the bodies of those thought to be impaired, the studies relied on by the state "give * * * a false impression that [they are] highly accurate." Finally Dr. Janofsky said that assessments of nystagmus, pupil size, lack of convergence, and vital signs are not sufficient for an opinion on

drug impairment; the symptoms of PCP or marijuana use, for example, vary wildly.

The last defense witness was Dr. Paul Pentel, a Hennepin County physician who specializes in drug intoxication and adverse drug reactions. He had no knowledge about the DRE program apart from that supplied by defense counsel. He knew of no independent, scientific validation of the process. He testified that he rarely tests for lack of convergence and that nystagmus may be present in depressant cases, but "it's not invariably present." He agreed that a police officer can be trained to evaluate vital signs and pupil size; but he thought "experience in various medical settings is required to become an accurate observer of * * * muscle tone." Pentel may employ a one-leg stand, heel-to-toe walk, and finger-to-nose test, but he normally does not use the Romberg test and he "[has] not seen that test used in literature and standardized." He cautioned that a toxicological confirmation reveals only that the subject "[has] had exposure to the drug * * *. It's not a measure of intoxication, it's not meant to be that." In Dr. Pentel's view un-"blinding" DREs by telling them before the exam what the arresting officer suspects, undermines their opinions. He thinks that the protocol is not reliable for determining impairment because "it has [not] been validated * * * and * * * it is certainly not something that is accepted by the medical community." He is of the opinion that something more than the evaluation done by a DRE is needed, and he stated he would not accept the utility of the protocol until a DRE evaluated a group of people who have not been arrested, the evaluation to be made without using the protocol.

As we said earlier, we agree, subject to some qualifications, with the trial court's ruling denying the motion to suppress Trooper Daly's testimony.

We begin our analysis with the proposition that, properly viewed, the protocol followed by Trooper Daly is not itself a scientific technique but rather a list of the things a prudent, trained and experienced officer should consider before formulating or expressing an opinion whether the subject is under the influence of some controlled substance.

Second, of the twelve steps of the protocol, few of them seem to call for any particular medical or scientific training or skill on the part of the officer. Certainly, the preliminary medical examination to determine whether the suspect needs medical attention, and the taking of pulse, temperature, and blood pressure are all well within the capabilities of Trooper Daly, who is a certified emergency medical technician.

Only the tests for horizontal and vertical nystagmus and for convergence are out of the ordinary, but they can hardly be characterized as emerging scientific techniques. Nystagmus and convergence have long been known and the tests contemplated by the protocol have been in common medical use without change for many years. The tests are simple and do not require the use of complicated equipment—the examiner's pen constitutes a suitable target. Nevertheless, this step—and, perhaps, the step calling for an examination for muscle rigidity as well—is "scientific" in the sense that we use the term when deciding whether to scrutinize evidence to ascertain if it has gained sufficient acceptance in scientific circles. The admissibility of evidence based on the use of nystagmus testing is not a question that we have previously addressed directly, but the issue has been under scrutiny in other courts. Compare *People v. Quinn,* 153 Misc.2d 139, 580 N.Y.S.2d 818, 826 (Dist.Ct.1991), *rev'd on other grounds,* 158 Misc.2d 1015, 607 N.Y.S.2d 534 (1993) with *Commonwealth v. Apollo,* 412 Pa.Super. 453, 603 A.2d 1023, 1028 (1992) *appeal denied,* 531 Pa. 650, 613 A.2d 556 (1992). *See also* Stephanie E. Busloff, *Can Your Eyes be Used Against You? The Use of the Horizontal Gaze Nystagmus Test in the Courtroom,* 84 J.Crim.L. & Criminology 203 (1993). It is, of course, obvious that the effectiveness of a nystagmus test as an element of an evaluation to determine drug impairment is not universally accepted. Indeed, had the experts been in agreement, there would have been no reason for the hearing.

■ Here, the trial judge determined that the nystagmus tests satisfied the require-

ments of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). Our review of the record convinces us that the trial judge did not abuse her discretion or arrive at a clearly erroneous conclusion in determining that the nystagmus tests satisfied the *Frye* standard.[3] *See Hagen v. Swenson,* 306 Minn. 527, 236 N.W.2d 161 (1975).

All of the experts recognized that the tests for nystagmus employed in the drug evaluation are standard neurological tests. The defense experts' challenge was directed to the utility of the tests for ascertaining drug impairment. The defense experts did not suggest that the use of certain drugs may not cause nystagmus but, rather that nystagmus is not "necessarily" present in all cases of drug use. It is not contended, however, that the presence or absence of nystagmus is determinative of the presence of drugs but only that nystagmus, when it is present, may be an element supportive of a conclusion of drug impairment based on the elements of the protocol, taken as a whole. And it may also support the identification of the drug category involved.

The other point of the defense challenge goes to the police officer's competence to draw conclusions based on the protocol. Basically, however, following the protocol does not involve any significant scientific skill or training on the part of the officer. Drug recognition training is not designed to qualify police officers as scientists but to train officers as observers. The training is intended to refine and enhance the skill of acute observation which is the hallmark of any good police officer and to focus that power of observation in a particular situation. For example, the protocol requires the officer to observe the suspect's performance of motor skill tests designed to reveal motor skill deficiencies of the kind one would expect to find if the subject were "under the influence" of

or impaired by the presence of some drug. To put it a different way, the protocol, in the main, dresses in scientific garb that which is not particularly scientific. Calling an officer trained in the art of observation pursuant to the protocol a "Drug Recognition Expert" seems to us to assume the conclusion. If the officer is an "Expert," then, of course, his or her expert opinion is admissible pursuant to Minn.R.Evid. 702. Moreover, calling the officer an "Expert" tends to lend weight to the officer's opinion.

■ In general it seems to us misleading for the state to present the officer as a "Drug Recognition Expert." That appellation suggests that there is something scientific about the officer's testimony, thus requiring the court to determine whether the scientific underpinnings of the testimony are adequately accepted in scientific circles. We are of the opinion, however, that the protocol in question does not demand the kind of scrutiny required for the presentation of some novel scientific discovery or technique. The real issue is not the admissibility of the evidence but the weight it should receive, and that is a matter for the jury to decide without being led to believe that the evidence is entitled to greater weight than it deserves. Therefore, in the courtroom the officer shall not be called a "Drug Recognition Expert." Perhaps the officer can be called a "Drug Recognition Officer" or some other designation which recognizes that the officer has received special training and is possessed of some experience in recognizing the presence of drugs without suggesting unwarranted scientific expertise. After careful consideration we conclude that opinion testimony based on nystagmus testing is admissible if a sufficient foundation has been laid for the opinion expressed[4] and provided that the trial court,

---

**3.** The state urges abandonment of the *Frye* standard in favor of the standard articulated in *Daubert v. Merrell Dow,* — U.S. —, 113 S.Ct. 2786. Because we affirm the determination that the *Frye* standard has been met here, we do not address the effect of the *Daubert* decision on the use or application of the *Frye* rule in Minnesota.

**4.** We refer counsel and courts to *State v. Superior Court ex rel. Cochise County,* 149 Ariz. 269, 718

P.2d 171 (1986) and *State ex rel. Hamilton v. City Court,* 165 Ariz. 514, 799 P.2d 855 (1990), cases which generally support admission of opinion testimony based on nystagmus testing but which caution counsel and courts about letting a witness go farther in expressing an opinion on the ultimate issue of intoxication or drug impairment than is justified.

when requested, gives an appropriate cautionary instruction.[5]

In summary, it seems to us that the use of a standard 12–step procedure for recognizing drug impairment leads to greater accuracy and consistency in the opinions of various officers than is likely if each officer develops her or his own format for deciding whether the suspect is drug impaired. We agree with the trial court that the officer should be allowed to give an opinion based on the officer's training and experience and his or her observations following the 12–step drug recognition protocol, as long as (a) there is sufficient foundation for the specific opinion expressed, (b) the state does not attempt to exaggerate the officer's credentials by referring to the officer as a "Drug Recognition Expert" or to unfairly suggest that the officer's opinion is entitled to greater weight than it deserves, and (c) the evidence otherwise survives Minn.R.Evid. 403 analysis. We add only that it should be obvious that the mere fact that such opinion testimony is admitted does not necessarily mean that such testimony by itself will be sufficient to support a guilty verdict.

Affirmed.

WAHL, Justice (dissenting).

I respectfully dissent. The DRE protocol on which a law enforcement officer bases an assessment of drug impairment is an emerging technique that must meet our *Frye/Mack* standard for scientific evidence. The trial court viewed the components of the DRE protocol separately and concluded that, except for the use of the HGN and vertical nystagmus tests, there is nothing new, novel, or controversial about any single component. With respect to the HGN and vertical nystagmus tests, the court concluded that the state had met its burden of showing that these tests are generally accepted as reliable indicators of impairment and thus satisfy the *Frye* standard. The court also did not find anything new or controversial about the "symptomatology matrix" used by the DREs to reach their conclusions or about allowing a

police officer to give an opinion that an individual is impaired. Therefore, the court found that the DRE protocol is not a novel scientific technique requiring that experts in the "field" generally agree that the evidence is reliable. As the testimony of Sergeant Page and Trooper Daly suggests, however, the protocol cannot be easily separated into its several steps but it is an assessment based on "the totality" of an officer's observations.

The trial court is right, of course, that there is "nothing new or controversial about allowing a police officer to give an opinion that an individual is impaired," but a police officer's application of medical or scientific tests and the rendering of an opinion on drug impairment based on those tests is an "emerging technique" that warrants a *Frye* inquiry. This is so because the field to which the technique belongs is not just law enforcement and forensics, as the state claims, but includes elements from the medical and neurological fields as well.

The *Frye/Mack* test, as set out in our cases, states that when determining admissibility of evidence based on emerging scientific techniques, we require "that experts in the field widely share the view that the results of [scientific testing] are scientifically reliable as accurate." *State v. Mack*, 292 N.W.2d 764, 768 (Minn.1980) (evidence obtained by hypnosis). *See State v. Jobe*, 486 N.W.2d 407, 419 (Minn.1992) (DNA evidence); *State v. Fenney*, 448 N.W.2d 54, 57 (Minn.1989) (electrophoresis); *State v. Schwartz*, 447 N.W.2d 422, 424 (Minn.1989) (DNA testing); *State v. Anderson*, 379 N.W.2d 70, 79 (Minn.1985) (graphological personality assessment); *State v. Kolander*, 236 Minn. 209, 219–22, 52 N.W.2d 458, 464–66 (1952) (lie detector test).

In the criminal context with its constitutional implications, it is not too much to require that expert testimony be accurate, valid, and reliable. No one doubts that an officer's assessment of drug impairment based on the personal observations and medi-

---

5. For a sample nystagmus cautionary instruction, which we neither approve nor disapprove, *see* Busloff, *supra*, at 237.

cal or scientific tests of the DRE protocol is expert testimony. Therefore, the DRE protocol must be tested for both its validity/accuracy, the ability to measure what it is supposed to measure, and its reliability, the consistency in obtaining the same results each time the procedure is performed. *See* Renee A. Forinash, *Analyzing Scientific Evidence: From Validity to Reliability with a Two–Step Approach,* 24 St. Mary's L.J. 223, 237–38 (1992).

The DRE protocol can be tested, but it has not yet been tested properly. None of the four studies[1] the trial court cites to support its conclusion that the DRE protocol is reasonably reliable in determining whether an individual is impaired by drugs prove that the DRE is a valid or reliable protocol for predicting drug impairment.[2] Evidence introduced at the trial court hearing indicated that none of the studies administered the DRE protocol in a blind fashion so as to insure their validity. In each study the DRE knew in advance that the suspect had already admitted to using drugs or that drugs or drug paraphernalia were found on or near the suspect at the time of his arrest—thus unblinding the study and tainting the DRE's evaluation. None of the studies provided for more than one DRE to evaluate the same subject, making it impossible to compare and judge the accuracy of the evaluations. None of the studies measured evaluation under the DRE protocol against the correct standard of ability to safely operate a motor vehicle— Minnesota law prohibits driving a motor vehicle while impaired by a controlled substance; it does not prohibit driving a motor vehicle with drugs present in one's urine. All experts agreed that the mere presence of drugs in a person's system does not mean the person is impaired.

Persons driving motor vehicles under the influence of a controlled substance should be apprehended and convicted, but they should not be convicted by the force of an opinion of impairment based on and enhanced by a DRE protocol which has not been proved to be valid and reliable. A study specifically designed to evaluate the validity and reliability of the protocol is currently under way at the Addiction Research Center in the National Institute on Drug Abuse at Johns Hopkins University. In this study scales are being designed for each component of the DRE protocol so that different DREs can evaluate the same subject and a comparison can be made of their evaluations. Experienced drug users are being recruited. The study will be doubleblind in that the DREs will not be allowed to ask persons questions about their drug use prior to the evaluation.

I would conclude that the evidence in this case does not establish that the DRE protocol meets the *Frye/Mack* standard and that an opinion on impairment based on that protocol is inadmissible.

---

1. The Johns Hopkins Study (1984) was a controlled study at Johns Hopkins University in which specific drug doses were administered to volunteer subjects who were then rated by four Los Angeles DREs. The Los Angeles Study (1986) was a field study at the LAPD in which DREs evaluated suspects who were arrested for driving under the influence of a drug or of drugs and alcohol. Blood samples from 173 suspects and the toxicological results of those samples were compared with the DRE opinions. The Arizona Study (1990) compiled 526 cases in which the toxicological results of urine samples were compared with the DRE opinions. The same comparison was made with 71 cases in the Minnesota Study (1993).

2. This was the testimony of both Dr. Jeffrey Janofsky, a forensic psychiatrist who teaches at Johns Hopkins University and who is an expert on research development, design, and review, and Dr. John Morgan.