2008-NMCA-137

194 P.3d 110

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Miriam I. ALEMAN, Defendant–
Appellant,**

and

**State Of New Mexico, Plaintiff–Appellee,**

v.

**Alberto Valenzuela, Defendant–Appellant.**

**Nos. 25,224, 25,225.**

Court of Appeals of New Mexico.

June 30, 2008.

Certiorari Denied, No. 31,250,
Aug. 25, 2008.

Gary K. King, Attorney General, Santa Fe, NM, M. Victoria Wilson, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Vicki W. Zelle, Assistant Appellate Defender Santa Fe, NM, for Appellants.

## OPINION

ROBINSON, Judge.

{1} In this opinion, we deal with a DUI prosecution in which Defendants ingested drugs rather than alcohol. We address the admissibility of the expert opinion testimony of a Drug Recognition Evaluator (DRE) regarding a 12–Step Protocol (Protocol), which is a process designed to enable law enforcement to identify (1) whether a subject's ability to operate a vehicle is impaired and (2) which category of drugs has affected a subject. We determine that the Protocol is not scientific in its entirety, but that the State laid an adequate foundation to introduce the individual, scientific steps of the Protocol. Although we conclude that the Protocol as a whole is not scientific, even if we were to hold otherwise, we would affirm because the State established a sufficient scientific foundation for the Protocol under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *State v. Alberico,* 116 N.M. 156, 861 P.2d 192 (1993). Because the State has established the scientific reliability of the Protocol, we further determine that a DRE may testify as an expert witness regarding the administration and results of the Protocol as it is applied to a particular defendant. Last, we hold that minor variations in the administration of the Protocol do not necessarily undermine the admissibility of Protocol evidence. We therefore affirm the decisions of the district court as to both Defendants, which denied Defendants' motions to exclude the testimony of the DREs.

## I. BACKGROUND

{2} Miriam Aleman and Alberto Valenzuela (Defendants) were arrested on separate occasions for driving under the influence of intoxicating liquor or drugs. In both cases, the arresting officers called a DRE in order to evaluate Defendants because they tested negative for blood alcohol content while showing other signs of intoxication and impairment. After Defendants were evaluated using the first ten steps of the Protocol, the DREs reached an opinion that Defendants

were under the influence of an illegal substance. In Aleman's case, the DRE opined that she was under the influence of cannabis, and this opinion was later confirmed by a blood test. In Valenzuela's case, the DRE concluded that he was under the influence of cocaine and heroin. The blood test for Valenzuela confirmed the presence of cocaine, but did not evidence any heroin.

{3} In relevant part, Defendants were charged under NMSA 1978, Section 66–8–102(C) (1999) (amended through 2007) for driving while under the influence of intoxicating liquor or any drug. Both Defendants filed motions to exclude the testimony of the DREs because the DREs did not qualify as scientific experts. The State filed a motion to consolidate the *Daubert* hearings for the two proceedings, and the district court held a consolidated *Daubert* hearing. Following the hearing, the district court entered an order denying Defendants' motions to exclude the testimony of the DREs. Defendants entered conditional guilty pleas and now appeal their convictions, claiming that the district court erred in admitting the DREs' testimony.

## II. DISCUSSION

■ {4} Rule 11–702 NMRA states that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." In *Daubert*, the United States Supreme Court developed a standard for the admission of expert testimony under Federal Rule 702. The "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. *Daubert* explains that the term "scientific" means "ground[ed] in the methods and procedures of science." *Id.* at 589–90, 113 S.Ct. 2786. The United States Supreme Court offered several factors for a district court to consider when assessing whether "the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in

issue." *Id.* at 592–94, 113 S.Ct. 2786. *Alberico* interpreted *Daubert* and adopted a reliability and validity standard for evaluating expert testimony in New Mexico. *Alberico*, 116 N.M. at 168, 861 P.2d at 204; *see State v. Torres*, 1999–NMSC–010, ¶ 24, 127 N.M. 20, 976 P.2d 20 ("*Alberico* therefore established evidentiary reliability as the hallmark for the admissibility of scientific knowledge."). *Alberico* also adopted the *Daubert* factors as a non-exclusive means to assess the validity and reliability of scientific testimony. *Alberico*, 116 N.M. at 168, 861 P.2d at 204; *see Torres*, 1999–NMSC–010, ¶ 25, 127 N.M. 20, 976 P.2d 20.

{5} In the present case, the district court concluded that the DREs could testify as experts based on their specialized knowledge regarding the Protocol in order to establish "whether the driver[s] w[ere] impaired by the use of drugs at or near the time the driver[s] w[ere] driving the motor vehicle[s]." Defendants contend that the State laid an insufficient foundation to establish the reliability of the Protocol under the requirements of *Daubert*. Specifically, Defendants argue (1) that the testimony of the State's scientific witnesses failed to establish the Protocol's validity and reliability; and (2) that the DREs, who testified about the application of the Protocol, did not qualify as scientific experts. Valenzuela further argues that the DRE in his case failed to properly perform the Protocol and, as a result, the evidence was not admissible even if the proper foundation was laid. The State responds by arguing that the *Daubert* analysis does not apply to the Protocol because it is not scientific knowledge. We consider each argument in turn, and we begin by considering the threshold questions of whether the Protocol is scientific knowledge, and whether the *Daubert* standard is applicable.

### A. Scientific Knowledge

■ {6} Rule 11–702 permits experts to testify based on "scientific, technical or other specialized knowledge." Our Supreme Court has explained that the "application of the *Daubert* factors is unwarranted in cases where expert testimony is based solely upon experience or training" and not scientific

knowledge. *Torres*, 1999–NMSC–010, ¶ 43, 127 N.M. 20, 976 P.2d 20 (internal quotation marks and citation omitted). Evidence is based on scientific knowledge if it is not self-explanatory, or if it is based on "a scientific or medical principle." *Id.* ¶ 31. "[T]he initial determination of whether to apply the *Alberico–Daubert* standard entails a conclusion of law that is subject to de novo review." *Id.* ¶ 28.

{7} The Protocol consists of twelve steps: (1) a breath alcohol test (BAT); (2) an interview of the arresting officer; (3) a preliminary examination to look at the suspect closely and search for an explanation for any observed impairment; (4) an eye examination, which includes horizontal gaze nystagmus test (HGN); (5) divided attention psychophysical tests, which assess whether a subject can perform two or more tasks at the same time; (6) taking an assessment of vital signs; (7) a dark room examination of the size of the pupils, the reaction of the pupils to light, and a check for evidence of ingestion of drugs around the nose and mouth; (8) examination of muscle tone; (9) an examination for injection sites; (10) a confrontation with the suspect, advancing the DRE's opinion regarding the category of drugs affecting the suspect; (11) documentation of the DRE's opinion; and (12) confirmation of the DRE's opinion by toxicology. The district court permitted the State to present testimony from the DREs that the Protocol established (1) that Defendants had drugs in their systems; and (2) that the drugs impaired Defendants' ability to operate a motor vehicle.

{8} Courts in other jurisdictions have taken different approaches to the question of whether the Protocol is scientific knowledge. The State encourages this Court to emulate the Supreme Court of Minnesota in *State v. Klawitter*, 518 N.W.2d 577 (Minn.1994), which held that the Protocol was not scientific. *Id.* at 585 ("Drug recognition training is not designed to qualify police officers as scientists but to train officers as observers."). *Klawitter* described the Protocol as "a list of the things a prudent, trained and experienced officer should consider before formulating or expressing an opinion whether the subject is under the influence of some controlled substance." *Id.* at 584. The federal district court of Nevada also concluded that the Protocol was not scientific, and that *Daubert* did not govern the admissibility of DRE testimony. *United States v. Everett*, 972 F.Supp. 1313, 1321 (D.Nev.1997). The District Court of Appeal of Florida considered the Protocol in its component pieces, and determined that "the general portion of the [P]rotocol is not scientific," and that HGN-a scientific step—had already been determined to be reliable. *Williams v. State*, 710 So.2d 24, 28–29, 32 (Fla.Dist.Ct.App.1998). In *State v. Baity*, the Supreme Court of Washington held that, although certain aspects of the Protocol were not scientific, the Protocol as a whole had "a scientific aspect, which tend[ed] to cast a scientific aura about the DRE's testimony." 140 Wash.2d 1, 991 P.2d 1151, 1157 (2000).

{9} We agree with *Klawitter* and *Everett* that many of the individual steps of the Protocol can easily be identified as non-scientific. For example, the following steps are based solely on observation: the officer's interview, the preliminary examination of the suspect, the assessment of vital signs, and the examination for injection sites. Based on training and experience, the DREs use these observations to document the physical signs that a person is impaired and to establish parameters for the toxicological tests, which will ultimately confirm the presence of a particular substance in the subject's system. The Protocol in its entirety is not scientific because some of the steps the DREs perform merely document a series of observations of "the common physical manifestations of intoxication," and these symptoms are self-explanatory. *Torres*, 1999–NMSC–010, ¶ 31, 127 N.M. 20, 976 P.2d 20 (internal quotation marks and citation omitted). Because we conclude that the process as a whole is not based on "a scientific or medical principle," we hold that the Protocol is not scientific. *See id.* (internal quotation marks and citation omitted).

{10} We are also persuaded by the reasoning in *Williams*. However, some of the individual steps of the Protocol are scientific processes and therefore require a scientific foundation. We observe that our Su-

preme Court has held that HGN testing is a scientific process, and that a scientific foundation must be laid in order for the results of such testing to be admitted. *Torres*, 1999–NMSC–010, ¶ 31, 127 N.M. 20, 976 P.2d 20 ("[T]he significance of the HGN observation is based on principles of medicine and science not readily understandable to [a] jury." (internal quotation marks and citation omitted)). We do not consider the Protocol's incorporation of scientific tests, such as HGN or toxicological analysis, to mandate a *Daubert* analysis for the entire Protocol. *See Klawitter*, 518 N.W.2d at 585. Nevertheless, in order for the results of such scientific tests to be admissible, it is necessary for the State to establish the foundation for the individual scientific tests. *See Torres*, 1999–NMSC–010, ¶ 23, 127 N.M. 20, 976 P.2d 20. We therefore consider whether the State laid a sufficient scientific foundation for the administration and results of the HGN tests. *See Williams*, 710 So.2d at 32 ("We take judicial notice that HGN test results are generally accepted as reliable and thus are admissible into evidence once a proper foundation has been laid that the test was correctly administered by a qualified DRE."); *Klawitter*, 518 N.W.2d at 585 ("[W]e conclude that opinion testimony based on nystagmus testing is admissible if a sufficient foundation has been laid for the opinion expressed.").

{11} In *State v. Lasworth*, this Court considered the admissibility of HGN testing in the context of impairment by alcohol and stated the following:

> [I]n order to lay a foundation for the admission of the arresting officer's statement that [the d]efendant was under the influence of alcohol or another central nervous system depressant, the State was required to establish two predicates: first, that the HGN FST is a scientifically valid means of discriminating between BACs below 0.08 percent and those at or above 0.08 percent; and, second, that a BAC at or above 0.08 percent correlates with diminishment of [the d]efendant's mental or physical driving skills.

2002–NMCA–029, ¶ 16, 131 N.M. 739, 42 P.3d 844. The State arguably established that "the HGN ... has been scientifically validat-

ed [a]s to discriminate between drivers above and below the statutory BAC limit, which in New Mexico is 0.08 percent." *Id.* ¶ 15. Nevertheless, the State failed to show that HGN test results correlate with impaired driving skills. *Id.* ¶ 16. The State could not "produce an expert who could explain in greater detail ... the physiological and pharmacological basis of the six cues that make up the HGN FST." *Id.* ¶ 23. We note that the State in the present case introduced the HGN test results for two purposes: (1) to show that Defendants were impaired at the time of the test, as in *Lasworth*; and (2) to establish the presence of a particular category of drug in Defendants' systems in order to narrow the range of drugs for which the toxicologist would test samples.

{12} The State offered the testimony of Karl Citek, an optometrist, and Sarah Kerrigan, a forensic toxicologist, in order to establish the required physiological relationship between HGN and impairment, as well as between HGN and a particular category of drugs. Dr. Citek gave the following testimony:

> There are ... two aspects of the eyes that the DRE evaluates. One is eye movements, and the other is the pupil's reaction to light.
>
> Drugs that will affect eye movements, the ability to track a target smoothly, the ability to maintain fixation, keep a stable gaze, those drugs typically fall into categories known as central nervous system depressants, inhalants and phencyclidine.
>
> On the other hand, drugs that form— that typically affect pupil size fall into the categories of central nervous system stimulants, hallucinogens, cannabis and narcotic analgesics.
>
> . . . .
>
> [A]s far as control of eye movements and pupil reactions are concerned, the effects that drugs—that impairment drugs have— are not necessarily, and very often, not on the muscles that make those particular eye movements or change the pupil, not on the muscles directly, but rather on the nerve control centers that innervate those muscles.
>
> . . . .

Those are the control centers that also control our normal physiology, our respiration, our heart rate. They gather information from the very sense organs, so it's very basic functioning, very—absolutely necessary functioning to work perfectly, so that you can survive and live normally.

Various of those nuclei, or nerve control centers, are specific to controlling eye movements and controlling pupil sizes. The drugs that will affect that part of the brain, the brain stem, specifically, have different effects on those different nerve control centers.

And then, depending on how that innervation changes, if the innervation is increased or decreased, that will affect the resulting eye movements, or will affect the resulting pupil sizes.

{13} Dr. Kerrigan testified that the HGN test results "help [toxicologists to] evaluate the likelihood that a person is under the influence of a substance." We are satisfied that the testimony presented established a physiological link between different HGN test results and the presence of certain categories of drugs in a subject's system.

{14} Dr. Citek explained that drugs from different categories affect pupil size and eye movement differently, and HGN is therefore a reliable means of narrowing the range of drugs by which a suspect is likely to be impaired. His testimony adequately demonstrated that certain HGN test results correlate with the brain's ability to process information. He testified that a subject's eyes provide insight into how the brain is reacting to the presence of drugs or alcohol. The nerves that dictate eye movement and pupil size also control "our normal physiology, our respiration, our heart rate." For example, he explained that when a subject's eyes "seem to ratchet and move ... quickly, ... as opposed to moving smoothly," it is indicative of "a problem at the level of the brain in the brain stem and in the cerebellum." He then related this physiological data to his observations of intoxicated persons, and how "they're not able to move their eyes separately from their heads."

{15} We also note that the State offered the testimony of the same witness, Marceline Burns, who had testified unsuccessfully in *Lasworth*. We are not persuaded that Dr. Burns' qualifications have changed significantly since *Lasworth*, when she "conceded that she herself had not conducted studies or experiments to determine how and why alcohol causes HGN and that her understanding of the mechanisms that produce HGN was based upon her review of the published results of studies by other researchers." *Id.* ¶ 17. Despite her inability to explain the physiological relationship between HGN and impairment, we consider relevant and reliable her testimony regarding the visible signs of impairment and its correlation to HGN results. She testified that she had conducted many laboratory studies, which examined the effects of alcohol and drugs on performance in a driving simulator. In one study regarding only alcohol impairment, she concluded that HGN was "almost as good as the entire test battery[;] the presence of the jerking of nystagmus was simply the most sensitive index." Based on her personal research, she further concluded that there was no better test than HGN to determine whether a driver is impaired by drugs.

{16} We are satisfied that the testimony of Drs. Citek, Kerrigan, and Burns explains the relationship between certain eye movements and impairment by drugs or alcohol. As a result, the State laid an adequate foundation for the admission of HGN test results to establish the presence of a certain category of drugs, and to show that Defendants' ability to operate a motor vehicle was impaired.

### B. Other Specialized Knowledge

{17} Although consideration of the *Daubert* factors as applied to the entire Protocol is unnecessary, we continue our analysis to determine whether the proper non-scientific foundation for expert testimony was laid under Rule 11–702. The State was required to establish that (1) the experts were qualified, (2) the testimony will assist the trier of fact, and (3) the testimony relates to scientific, technical, or other specialized knowledge. *Alberico*, 116 N.M. at 166, 861 P.2d at 202. We begin with the final factor.

{18} The district court found, and we agree, that the DREs' expert status is based on other "specialized knowledge." Witness testimony is based either on the perception of the witness, *see* Rule 11–701 NMRA, or on the "knowledge, skill, experience, training or education" of the witness. Rule 11–702. Although much of the testimony of a DRE is nothing more than the DRE's personal observations of a subject, those observations would be meaningless without the DRE's ability to interpret those observations through the lens of the Protocol training. This sort of testimony is more than lay opinion testimony under Rule 11–701, but it is also less than scientific testimony under Rule 11–702. The district court of Nevada distinguished "other specialized knowledge" and "scientific testimony" in the following way. "Specialized knowledge, while it may result in conclusions or opinions drawn from observations and experience with scientific facts, deals more with the technical application, rather than the theoretical application of facts." *Everett*, 972 F.Supp. at 1319. The DRE applies knowledge gained through training in the Protocol to the observations made during the application of the Protocol. We thus conclude that the DREs' testimony about the administration and results of the Protocol relate to other specialized knowledge.

{19} The DREs' testimony is helpful to the trier of fact because although many jurors might be familiar with the individual symptoms that the DREs observed, "we doubt that a typical juror would have had the detailed information" about the correlation between these observations and a particular category of drug. *State v. Hueglin*, 2000–NMCA–106, ¶ 16, 130 N.M. 54, 16 P.3d 1113. Additionally, the DREs were appropriately qualified as experts because the State established that they had undergone extensive training and had significant experience in the administration of the Protocol. Although this evidence would not be sufficient to qualify an expert who would establish a scientific foundation, *see Torres*, 1999–NMSC–010, ¶ 37, 127 N.M. 20, 976 P.2d 20, we conclude that it is a sufficient foundation to qualify an expert to testify regarding specialized knowledge. We are particularly satisfied by the DREs' qualifications as experts with specialized knowledge because the DREs' opinion will be corroborated by a toxicologist. *See id.* ¶ 36. Based on these considerations, we hold that the State established an adequate foundation for the DREs to testify as expert witnesses regarding their specialized knowledge of the Protocol, as well as the administration and results of the Protocol as to Defendants.

{20} Defendants also argue that because the DREs' testimony is nothing more than lay opinion testimony, it is unfairly prejudicial under Rule 11–403 NMRA to "cloak such a guess under the guise of ... expertise." Rule 11–403 prevents a party from offering evidence if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice." Our Supreme Court has explained that "[u]nfair prejudice ... refers to evidence that tends to suggest decision on an improper basis." *State v. Anderson*, 118 N.M. 284, 302, 881 P.2d 29, 47 (1994). Defendants' argument of Rule 11–403 is premised on the conclusion that the DREs did not qualify to testify as experts. Because we conclude that the DREs properly testified as experts about matters that would assist the jury in making its determination, we consider Defendants' Rule 11–403 argument to be without merit.

## C. *Daubert*

{21} Defendants argue that the trial court implicitly made the initial determination that the DREs' expertise was scientific in nature and that the court therefore held a *Daubert* hearing. Even if we were to agree with the trial court's evaluation of the Protocol as scientific in nature, we would still affirm because our review of the evidence presented during the hearing supports the trial court's conclusion that the evidence was admissible. *See State v. Sampson*, 167 Or. App. 489, 6 P.3d 543, 549–50, 558 (2000) (concluding that the Protocol is scientific, but holding it sufficiently reliable to be admissible). During our review, we will conduct a *Daubert* analysis to determine whether the district court abused its discretion by admitting evidence of the Protocol as scientific expert testimony. *Torres*, 1999–NMSC–010,

¶ 27, 127 N.M. 20, 976 P.2d 20. We are required to conduct "a meaningful analysis of the admission [of] scientific testimony to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case." *Id.* (alteration in original) (internal quotation marks and citations omitted). Our Supreme Court has succinctly described the *Daubert* factors.

(1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known [or] potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.

*Torres,* 1999–NMSC–010, ¶ 25, 127 N.M. 20, 976 P.2d 20 (alteration in original) (internal quotation marks and citations omitted).

### 1. Testability

▮ {22} The first factor considers whether a technique can be tested. The focus of this factor is not whether tests have shown that a technique works or is successful, but whether there are methods that subject the technique to scientific scrutiny. *See Lee v. Martinez,* 2004–NMSC–027, ¶ 23, 136 N.M. 166, 96 P.3d 291. The district court found that the Protocol has "been tested in both laboratory and field studies." Albeit with different intentions, both Defendants and the State cite to a handful of studies that have been conducted to determine the efficacy of the Protocol. "Thus, it appears that by attempting to refute the [state's] theory and methods with evidence about deficiencies in both the results and the testing of the results, the defendants have conceded that the theory and methods can be tested." *Anderson,* 118 N.M. at 297, 881 P.2d at 42 (internal quotation marks and citation omitted).

### 2. Peer Review and Publication

▮ {23} The second factor requires a technique to have been subjected to peer review or publication. Again, *Lee* is instruc-

tive. "We are only looking at whether the scientific technique has been subjected to peer review and publication, not the validity of the scientific research or the scientific community's response to the research." 2004–NMSC–027, ¶ 27, 136 N.M. 166, 96 P.3d 291. "The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Anderson,* 118 N.M. at 297, 881 P.2d at 42 (internal quotation marks and citation omitted).

▮ {24} The district court found that the Protocol has "been published to include peer-reviewed publications." The State cites to one peer-reviewed study and two other studies, which were apparently not published in a peer-reviewed journal. Aleman directs our attention instead to a study (Hlastala Study) that evaluates the studies cited by the State. Defendant uses the Hlastala Study to question the accuracy and neutrality of the earlier studies. In *Anderson,* our Supreme Court faced a similar situation in which "many of the articles [had] not been published in a 'peer-reviewed journal' in the strict sense of that term." *Id.* Nevertheless, the Court acknowledged that the trial court found that "techniques received adequate scrutiny through presentations at scientific conferences, workshops and other forums for the exchange of ideas and through the dissemination of unpublished and non-peer-reviewed writings." *Id.* (internal quotation marks omitted). As a result, the *Anderson* Court concluded that the "techniques [had] been subjected to peer reviews and publication" and that the *Daubert* factor was satisfied. *Id.* at 298, 881 P.2d at 43. The three studies cited by the State and the Hlastala Study all indicate that the Protocol has been the subject of scrutiny of the scientific community. Although the studies do not agree about the Protocol methods, "[t]he fact is that the ... techniques have been subjected to peer review and publication and, therefore, this factor is satisfied." *Id.* at 298, 881 P.2d at 43. Any dispute about the accuracy of the Protocol's methods is a question of "weight of

the evidence and not to its admissibility." *Id.* at 299, 881 P.2d at 44.

### 3. Standards and the Rate of Error

{25} The third factor considers the existence of standards to control the operation of the technique and the rate of error for the technique. In *Lee,* our Supreme Court considered the existence of standards for the polygraph examinations. The Court concluded that polygraph examiners underwent extensive training and certification, and that Rule 11–707 NMRA and the American Polygraph Association had established standards for the application of polygraphs. *Lee,* 2004–NMSC–027, ¶¶ 37–40, 136 N.M. 166, 96 P.3d 291. DREs similarly receive extensive training and certification. The regulating and certifying body for the DRE program, the International Association of Chiefs of Police (IACP), establishes and maintains minimum standards for all phases of training, including certification. In order to qualify for training, an officer must be nominated in writing by his or her commanding officer. The training consists of a two-day initial school and an examination. The officer is then permitted to take seven more days of training if the officer performs well enough on the examination. An evaluation period follows in which the officer must demonstrate proficiency by properly conducting and interpreting DRE evaluations that are given to actual suspects. The minimum national standards require the officer to conduct twelve drug evaluations. The officer must evaluate individuals who are under the influence of at least three of the seven categories of drugs, and all three of the officer's opinions must be supported by toxicology. The officer also takes a comprehensive written examination, which requires articulation of the signs and symptoms of the various drugs, including numerous drug combinations. The IACP issues certificates which are valid for two years. Recertification and continuing education are necessary in order to maintain certification, and a DRE must attend a minimum of eight hours of continuing educational training every two years. The district court therefore did not abuse its discretion by finding that "[s]trict standards for the certification of DRE programs are in place."

{26} *Lee* explains that the rate of error factor is required in order to establish that the technique provides "evidence that … has a tendency to make the existence of a fact more or less probable than it would be in the absence of the evidence." *Id.* ¶ 35. We observe that the rate of error discussed in subsequent paragraphs is the rate of error for the DRE's opinion as to whether the subject is impaired and by which category of drugs. The error rate is not related to the confirmation of results by toxicology.

{27} There is some dispute about the rate of error. One study reveals that the DREs were accurate in identifying at least one drug in more than ninety percent of evaluations. In cases in which more than one category of drugs was present in the subject's system, the State claims that toxicology confirmed the DREs' opinion regarding at least one drug in 83.5 percent of the evaluations. Defendants argue that these statistics are inflated because the calculations ignore the number of false negatives. For example, during the course of one study, the DREs incorrectly judged five percent of the controls to be intoxicated, while those subjects were given only placebos. Defendants contend that the success rate does not account for these failures and, therefore, the State's statistical showing is insufficient to establish reliability.

{28} We disagree. The five percent rate of error in the control group is the error rate that most establish for the Protocol's reliability. The purpose of the Protocol is not to identify the drug by which a subject is affected. Instead, the Protocol is designed to show whether the subject is impaired, and by what category of drugs the subject is impaired. The DREs were incorrect in identifying some sort of drug impairment in only five percent of the control group cases. It is unclear from the record what the impairment error rate was over the entire range of subjects not only limited to the control group, but the rate of error in recognizing impairment is remarkably low in that study. The rate of error for the DREs defining the correct category of drugs in both single drug use and multiple drug use scenarios is also

sufficient to establish a "tendency to make the existence of a fact more or less probable than it would be in the absence of the evidence." *Id.* ¶ 35. We further note that Defendants have "ample opportunity through cross-examination and argumentation to cast doubt upon the results of any particular [application of a technique] that have been admitted into evidence." *Id.* ¶ 32.

### 4. Accepted in the Field

{29} The final factor examines whether or not a technique has been generally accepted in a particular scientific field. The district court found that "[t]he [Protocol] is generally accepted in the particular scientific field of forensic toxicology." Although the Protocol has been the subject of conflicting studies and scientific opinions as established by the review of the studies in the preceding paragraphs, we conclude that this finding is not an abuse of discretion. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case is clearly untenable or is not justified by reason." *Heath v. La Mariana Apartments,* 2007–NMCA–003, ¶ 18, 141 N.M. 131, 151 P.3d 903 (internal quotation marks and citation omitted), *aff'd,* 2008–NMSC–017, 143 N.M. 657, 180 P.3d 664. Dr. Kerrigan testified that "the DRE program is generally accepted amongst the scientific community." She explained that the reason the Protocol is generally considered a reliable tool in making an impairment assessment is that "[o]bserving behavior, measuring physiological parameters like blood pressure, pulse and pupil size, was not invented by a DRE officer. It's very well[-]accepted scientific knowledge." Based on this testimony, we see no abuse of discretion in the district court's finding that the Protocol is a generally accepted practice among forensic toxicologists.

{30} "[A]ny doubt about the admissibility of scientific evidence should be resolved in favor of admission." *Lee,* 2004–NMSC–027, ¶ 48, 136 N.M. 166, 96 P.3d 291. "The remedy for the opponent of [scientific] evidence is not exclusion; the remedy is cross-examination, presentation of rebuttal evidence, and argumentation." *Id.* The district court found that "[t]he DRE evaluation provides critical information which assists the toxicologist in forming an opinion as to whether the driver was impaired by the use of drugs at or near the time the driver was driving the motor vehicle," and that "[w]ithout the evaluation of the DRE, a toxicologist would be unable or limited in offering an opinion as to the drug's actual effect on a driver's mental and physical ability to operate a motor vehicle." We are also impressed with the fact that, whether the Protocol is deemed non-scientific or scientific, every case called to our attention that has considered the issue had held the DREs' testimony to be generally admissible. Accordingly, we hold that the district court did not abuse its discretion by finding that the State established that the Protocol met the reliability and validity standards set forth in *Daubert.*

### D. Testimony of the DREs

{31} Defendants also contend that the DREs were not competent witnesses to testify about the Protocol because they were not competent to establish the scientific foundation for the Protocol. *Torres* speaks directly to the acceptable content of a DRE's testimony. "In the context of HGN testing, we conclude that such non-scientific experts may testify, provided that another, scientific expert first establishes the evidentiary reliability of the scientific principles underlying the test." *Torres,* 1999–NMSC–010, ¶ 46, 127 N.M. 20, 976 P.2d 20. *Torres* continued and stated generally that "experts who lack the qualifications necessary to testify about scientific knowledge ... may, because of their training, experience, and specialized knowledge, testify as to the *administration* and *specific results* of the test after it has been shown to meet the requirement of evidentiary reliability." *Id.* ¶ 47. In the present case, we have already held that an adequate foundation was laid by competent witnesses to establish the evidentiary reliability of HGN test results in this context and to establish the scientific validity and reliability of the entire Protocol. In addition, the toxicologist testified as to the results of the blood and urine tests, which corroborated the DREs' conclusions. Under these circumstances, the

**90**

DREs were properly permitted to testify about the administration and specific results of the Protocol. *See id.* Defendants' contention in this regard is without merit.

### E. Proper Administration of the Protocol

█ {32} Finally, Valenzuela asserts that the DRE in his case improperly performed the Protocol, and that the failure to complete the Protocol as required negated any evidentiary foundation that the State may have succeeded in laying. The DRE failed to record Valenzuela's temperature because the thermometer malfunctioned, and he did not record the third pulse rate because he was distracted. The State maintains that the DRE did not deviate from the Protocol, but instead was prevented from recording the results of the temperature and the third pulse rate.

{33} Valenzuela cites to *State v. Aman,* 194 Or.App. 463, 95 P.3d 244 (2004) to support his argument that "an incomplete protocol renders any claimed validation for the 12–[S]tep [P]rotocol meaningless." We conclude that *Aman* is distinguishable. The DRE in *Aman* did not complete the twelfth step of the Protocol, confirmation of the opinion through toxicology. *Id.* at 249. The Oregon Court of Appeals concluded that "the omission of the corroborating toxicology report deprives the test of a major element of its scientific basis." *Id.* In the present case, because the toxicologist performed the validating blood test, we do not consider the DRE's failure to record a third pulse rate or a temperature reading to deprive the Protocol of its validity. Valenzuela would have had an opportunity to cross-examine the DRE and point out the failure to record the required data.

### III. CONCLUSION

{34} We affirm the district court.

{35} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CELIA FOY CASTILLO, Judges.