2008-NMSC-017

180 P.3d 664

Melanie HEATH, individually and as next friend of Holdyn H., a minor, Plaintiff–Petitioner,

v.

LA MARIANA APARTMENTS and Gerald Deabel, Defendants–Respondents.

No. 30,129.

Supreme Court of New Mexico.

March 12, 2008.

Martin, Lutz, Roggow, Hosford & Eubanks, P.C., William L. Lutz, David Price Lutz, Stephen E. Hosford, Las Cruces, NM, for Petitioner.

Cervantes Moberly Law Firm, K. Joseph Cervantes, Las Cruces, NM, L. Helen Bennett, P.C., Linda Helen Bennett, Albuquerque, NM, for Respondents.

## OPINION

BOSSON, Justice.

{1} In this appeal, we direct our attention to the Uniform Building Code ("UBC" or "the Code") as a potential source of a jury instruction on negligence per se. We examine the circumstances under which the UBC imposes an obligation to retrofit conditions in older apartment buildings that complied with the UBC edition in effect at the time of construction, but which no longer comply with newer editions of that code. Particularly, we examine whether any such obligation in this case with regard to guardrail spacing is sufficiently specific to depart from the common law standard of ordinary care and justify a jury instruction on negligence per se. We agree with the Court of Appeals that the UBC falls short of specificity in this particular instance, and no such instruction was warranted. *See Heath v. La Mariana Apartments*, 2007–NMCA–003, ¶ 14, 141 N.M. 131, 151 P.3d 903. We affirm, specifically adopting the prior analysis of the Court of Appeals in *Abeita v. Northern Rio Arriba Electric Cooperative*, 1997–NMCA–097, 124 N.M. 97, 946 P.2d 1108, with regard to negligence per se.

## BACKGROUND

{2} On July 28, 2001, Plaintiff Melanie Heath was standing with her three-year-old son, Holdyn, on the second-story balcony in front of the entrance to her apartment at La Mariana Apartments (the Apartments), owned by Gerald Deabel (Defendant) in the City of Las Cruces. Plaintiff went inside to answer the telephone and Holdyn fell through an eight and three-quarters inch space between a wooden roof support column and the first vertical post of the balcony guardrail, landing head first on the pavement below. As a result of his fall, Holdyn suffered a fractured skull and allegedly developed post-traumatic epilepsy.

{3} Plaintiff filed a negligence lawsuit against Defendant on behalf of herself and as next friend of Holdyn. At trial, the district court directed a verdict against Plaintiff on

her claim for negligence per se, finding that the UBC did not contain a standard specific enough to support a jury instruction on negligence per se. On the remaining issue of common law negligence, the jury found that Defendant was not negligent. Plaintiff appealed the district court's rejection of her negligence per se instruction, but the Court of Appeals affirmed.

{4} The Apartments were constructed in 1982 and were purchased by Defendant in 1994. At the time the Apartments were built, their design and construction was governed by the 1979 edition of the UBC, as adopted by ordinance. The 1979 UBC specified that the maximum spacing between guardrail posts on balconies was nine inches. The guardrail posts in front of Plaintiff's second-floor apartment measured just under nine inches, and thus were in compliance with the edition of the UBC in effect at the time the Apartments were built.

{5} Subsequent editions of the UBC adopted by the City reduced the maximum spacing between guardrail posts from nine inches to six inches, and then from six inches to four inches. These revisions were made in response to safety concerns; specifically, children were falling through or getting stuck between the guardrail posts. The version of the UBC in effect when Holdyn fell specified a four-inch spacing. However, a question remains as to whether the UBC requires owners like Defendant to update or retrofit their property, in this case by reducing the guardrail spacing to no more than four inches.

{6} We granted Plaintiff's petition for a writ of certiorari to review that question and determine whether the UBC provisions relied upon by Plaintiff support an instruction on negligence per se. This issue is a matter of law that we review de novo. *See Acosta v. City of Santa Fe*, 2000–NMCA–092, ¶ 16, 129 N.M. 632, 11 P.3d 596 (interpreting ordinance to determine if legal duty exists is a question of law).

**DISCUSSION**

■ {7} We apply a four-part test to determine whether a negligence per se instruction is appropriate in a given case.

(1) [T]here must be a statute which prescribes certain actions or defines a standard of conduct, either explicitly or implicitly, (2) the defendant must violate the statute, (3) the plaintiff must be in the class of persons sought to be protected by the statute, and (4) the harm or injury to the plaintiff must generally be of the type the legislature through the statute sought to prevent.

*Archibeque v. Homrich*, 88 N.M. 527, 532, 543 P.2d 820, 825 (1975). Only the first factor is at issue in this case.

■ {8} We agree with the Court of Appeals that the first factor—whether the statute defines a standard of conduct—is properly evaluated under the analysis set forth in *Abeita*, 1997–NMCA–097, 124 N.M. 97, 946 P.2d 1108. *See Heath*, 2007–NMCA–003, ¶¶ 8–9, 141 N.M. 131, 151 P.3d 903. In that case, our Court of Appeals found "substantial authority for the proposition that a negligence-per-se instruction is appropriate only if the statute or regulation defines the duty with specificity." *Abeita*, 1997–NMCA–097, ¶ 21, 124 N.M. 97, 946 P.2d 1108. Thus, when a statute imposes a specific requirement, there is an absolute duty to comply with that requirement, and " 'no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care.' " *Id.* (quoting *Swoboda v. Brown*, 129 Ohio St. 512, 196 N.E. 274, 278 (1935)).

■ {9} However, " 'where duties are undefined, or defined only in abstract or general terms,' " leaving it to the jury to evaluate the factual circumstances of the particular case to determine whether the defendant acted reasonably, then a negligence per se instruction is not warranted. *Id.* (quoting *Swoboda*, 196 N.E. at 278); *see also Watkins v. Hartsock*, 245 Kan. 756, 783 P.2d 1293, 1297 (1989) ("The distinction between 'negligence' and 'negligence per se' is the means and method of ascertainment, in that the former must be found by a factfinder from the evidence, while the latter results from violation of the specific requirement of law or ordinance; and the only fact for the determination of the factfinder is the commission or omission of the specific act inhibited or re-

quired." (Quoted authority omitted.)) The task for any court, then, is one of statutory construction to determine whether the statutory or regulatory provisions at issue define with specificity what is "reasonable" in a particular circumstance, such that the jury does not have to undertake that inquiry. *See Abeita,* 1997–NMCA–097, ¶¶ 23–25, 124 N.M. 97, 946 P.2d 1108 (noting that regulations requiring electric lines to be maintained so as to reduce hazards to life "as far as practicable" and provide "adequate clearance" were indistinguishable from a standard of reasonable care, and thus would not justify a negligence per se instruction unless other provisions in the same regulations supplied further specificity).

{10} Plaintiff contends that various provisions of the 1997 UBC, when read together, establish a sufficiently specific standard to support an instruction on negligence per se in this instance. The four-inch guardrail spacing requirement in Section 509 is, by itself, specific enough if this were new construction. The question, however, is whether the UBC is sufficiently specific with regard to any obligation to retrofit.

{11} Plaintiff points to two other provisions of the UBC that she claims are relevant to retrofitting. One of these provisions is contained in Section 102, which falls under the chapter entitled "Administration," and states that:

> All buildings or structures regulated by this code that are structurally unsafe or not provided with adequate egress, or that constitute a fire hazard, or are otherwise *dangerous to human life* are, for the purpose of this section, unsafe.
>
> . . . .
>
> All such unsafe buildings, structures or appendages are hereby declared to be public nuisances and shall be abated by repair, rehabilitation, demolition or removal. . . .

(Emphasis added.) The other provision to which Plaintiff directs our attention is Section 3401, which is contained in the chapter labeled "Existing Structures." This provision states that "[b]uildings in existence at the time of the adoption of this code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the adoption of this code, provided such continued use is not *dangerous to life.*" (Emphasis added.)

{12} We also take note of Section 3402, which is a type of "grandfather clause," providing that "[a]ll devices or safeguards required by [the] code shall be maintained in conformance with the code edition under which installed." Thus, as a kind of general rule, Section 3402 does not require property owners to retrofit the devices or safeguards on their property when new versions of the UBC are adopted, but instead allows them to maintain such safeguards as is, so long as they conform to the code edition under which they were installed. For the convenience of the reader, we will refer to Section 509 as the "Guardrail Spacing provision," Section 102 as the "General Safety provision," Section 3401 as the "Use of Existing Structures provision," and Section 3402 as the "Grandfather provision" throughout the rest of this Opinion.

{13} Plaintiff reads these provisions to mean that any condition that is "dangerous to life" must be abated by bringing that part of the building up to code. She reasons that the UBC creates a duty on the part of property owners to re-inspect their premises upon periodic revisions to the UBC and retrofit any part of the building that is dangerous to life, regardless of whether it conformed with the code at the time of construction. Excessive guardrail spacing can be a condition dangerous to human life, reasons Plaintiff, if a young child falls through to the pavement below. Plaintiff argues that the guardrail spacing requirement, having been reduced over the years from nine inches to four inches, imposes a duty to retrofit the guardrails to comply with the new four-inch spacing requirements, which would have prevented her son from falling. Thus, according to Plaintiff, this duty to retrofit, imposed by the UBC, was properly the basis for a negligence per se instruction.

■ {14} We acknowledge that parts of the UBC and similar safety and design codes have properly formed the basis for negligence per se instructions in cases from both

New Mexico and other jurisdictions. *See, e.g., Sanchez v. J. Barron Rice, Inc.,* 77 N.M. 717, 722–23, 427 P.2d 240, 244–45 (1967) (trial court erred in refusing to give a negligence per se instruction based on violation of plumbing-gas code); *Anderson v. Welsh,* 86 N.M. 767, 773, 527 P.2d 1079, 1085 (Ct.App. 1974) (negligence per se instruction based on violation of the UBC); *see also Alderman's Inc. v. Shanks,* 536 N.W.2d 4, 10–11 (Minn. 1995) (negligence per se instruction based on violation of the Uniform Fire Code). We further note that vagueness in a particular term may be resolved by other, more specific provisions of the Code. *See Abeita,* 1997–NMCA–097, ¶ 25, 124 N.M. 97, 946 P.2d 1108 (vagueness in the term "adequate clearance" was resolved by provision setting forth specific minimum clearances in certain situations). Our first duty, therefore, is to closely analyze the text of the UBC and look for any evidence that its authors intended to require that guardrail spacing must be modified periodically as a condition deemed by the code to be dangerous to life.

 {15} A specific standard of care cannot be manufactured simply by selecting several unrelated provisions from a complex code and reading them together. The relevant provisions should be somehow related to one another within the structure of the Code to demonstrate an intent on the part of the enacting body to fix a standard of care more specific than the common law.[1] *See, e.g., Aetna Cas. & Sur. Co. v. McMichael,* 906 P.2d 92, 99 (Colo.1995) (en banc) (noting that unrelated provisions of Colorado's uninsured motorist statute "should not be read together to create an unintended limitation on the [uninsured motorist] coverage requirements of [the statute]"). Thus, the issue of statutory construction in this case is whether the

term "dangerous to life," as it is used in the General Safety provision and the Use of Existing Structures provision, adopts by reference the four-inch spacing in the most recent Guardrail Safety provision, and imposes an obligation to retrofit as a condition dangerous to life. We do not find these provisions to be correlated in a manner as straightforward as Plaintiff suggests. We now turn to the text of the UBC.

{16} All of the relevant provisions previously discussed appear in Volume I of the 1997 UBC, which is designated "Administrative, Fire-and Life–Safety, and Field Inspection Provisions." Neither the General Safety provision nor the Use of Existing Structures provision ("dangerous to life") refers specifically to the Guardrail Safety provision and its four-inch spacing requirement, or even to the chapter on General Building Limitations within which the Guardrail Safety provision appears. The Use of Existing Structures provision ("dangerous to life") does refer to Appendix Chapter 34, Division I of which is entitled "Life–Safety Requirements for Existing Buildings Other than High–Rise Buildings." Section 3406 of that appendix states that its purpose is "to provide a reasonable degree of safety to persons occupying existing buildings *by providing for alterations to such existing buildings that do not conform with the minimum requirements of this code.*" (Emphasis added.) The remaining sections in Appendix Chapter 34 set forth specific requirements, expressly subject to "alterations" or retrofitting, for items such as exits, enclosure of vertical shafts, basement access, sprinkler protection, standpipes, smoke detectors, and separation of occupancies. There is no reference to guardrail spacing within this express subject of "alterations."

---

1. We note that the issue is not one of notice to the property owner; the property owner does not have to know of the statute, ordinance, or regulation and its contents in order for such to be used to measure the propriety of his conduct. *See Jaramillo v. Fisher Controls Co.,* 102 N.M. 614, 620, 698 P.2d 887, 893 (Ct.App.1985). The question is simply whether the legislature or other enacting body has defined a standard of care such that the jury may be instructed on that standard in lieu of the common law standard. However, the issue of knowledge *of the violation*

*itself*—i.e., whether the defendant knew or should have known of the defective condition—may be relevant to whether the violation is excused. *See Gore v. People's Sav. Bank,* 235 Conn. 360, 665 A.2d 1341, 1349 (1995) (observing that "even if a defendant has contravened a statute the violation of which constitutes negligence per se, that defendant usually may avoid liability by showing that 'he neither knows nor should know of the occasion for compliance' " (quoting 2 Restatement (Second) of Torts § 288A (1965))).

{17} Thus, Section 3406 appears to provide specific exceptions to the general statement in the Grandfather provision that "[a]ll devices or safeguards required by [the] code *shall be maintained in conformance with the code edition under which installed."* (Emphasis added.) Presumably, then, property owners must bring those specific items—e.g., exits, smoke detectors, sprinkler systems—into compliance with each new version of the Code. However, no provision is made for updating guardrail spacing. It is therefore reasonable to assume that the drafters of the UBC did not intend to impose an affirmative duty on property owners to bring guardrail spacing into conformance with each new version of the Code. Rather, guardrail spacing appears to fall under those "devices or safeguards" that can be "maintained in conformance with the code edition under which installed." UBC § 3402.

{18} Because the Use of Existing Structures provision does not adopt the Guardrail Spacing provision, all that remains is the "dangerous to life" standard as a general admonition. Literally, the term "dangerous to life" is not identical to the terms "reasonable person" and "ordinary care," thus suggesting that the dangerous to life standard does not simply mimic the common law standard. In practical effect, however, the two share far more similarities than differences. They each require the jury to evaluate and weigh the circumstances of the case to determine whether the standard was met. Property owners who have allowed conditions that are dangerous to life to persist on their property will most often be found negligent under the common law standard.[2] In other words, a reasonable owner would usually respond to a condition on his or her property that was dangerous to life and take reasonable measures to correct it. *See Gourdi v. Berkelo,* 1996–NMSC–076, ¶ 8, 122 N.M. 675, 930 P.2d 812 ("[A] landlord is bound by the standard of ordinary care, and must, prior to leasing the premises, remedy such dangerous conditions as an inspection conducted with

ordinary care would reveal." (Citation omitted.)).

{19} In the absence of something more specific in terms of a required course of conduct for property owners, the term "dangerous to life" is too broad and lacks the requisite focus to form the basis for a negligence per se instruction. Put another way, the statutory term adds little if anything to the common law standard of ordinary care because, if property owners have to exercise ordinary care, then obviously they have to respond to a life-threatening condition. *See McNeil Pharm. v. Hawkins,* 686 A.2d 567, 579 (D.C.1996) ("[A] statute or regulation offered to establish a standard for negligence per se purposes must not merely repeat the common law duty of reasonable care, but must set forth specific guidelines to govern behavior." (Quoted authority omitted.)) *Short v. Spring Creek Ranch, Inc.,* 731 P.2d 1195, 1198 (Wyo.1987) ("The thrust of the negligence per se rule is that a legislative or administrative rule fixes a standard for all members of the community *which does not require a specific interpretation by the jury,* and thus certainty is promoted." (Emphasis added.)). Thus, both the trial court and the Court of Appeals correctly ruled that the UBC does not support a negligence per se instruction, stating that property owners are required to bring guardrails into compliance with newly adopted versions of that code.

{20} We acknowledge some confusion in our case law regarding the specificity of statutes that qualify for a negligence per se instruction. Our research has revealed previous cases from both the Court of Appeals and this Court which suggest that statutes or ordinances that do no more than restate the common law standard of ordinary care can form the basis for a negligence per se instruction. For instance, in *Lozoya v. Sanchez,* 2003–NMSC–009, ¶ 33, 133 N.M. 579, 66 P.3d 948, we upheld a negligence per se instruction based on NMSA 1978, Section 66–7–318(A) (1971), which reads, "The driver of a motor vehicle shall not follow another vehicle

---

2. While we do not wish to speculate as to why the jury in this case found that Defendant was not negligent in keeping the guardrail spacing as it was, particularly when young children were living in the second floor apartments, we do take

note of evidence in the record of negligence on Plaintiff's part as well as evidence of lack of causation with regard to Holdyn's injuries. Plaintiff does not challenge the jury verdict for lack of substantial evidence.

more closely than is *reasonable and prudent,* having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." (Emphasis added.) Similarly, in *Roderick v. Lake,* 108 N.M. 696, 698–99, 778 P.2d 443, 445–46 (Ct.App.1989), the Court of Appeals held that a statute providing that "[i]t is unlawful for any person *negligently* to permit livestock to wander or graze upon any fenced highway at any time," could support a finding by the trial court that the defendants were negligent per se. (Quoted authority omitted and emphasis added.)

{21} Neither of these prior opinions evaluated their statutes under the principles set forth in *Abeita,* which require the statute to contain a specific standard of care that does not merely repeat the common law standard. Had the statutes in *Lozoya* and *Roderick* been analyzed pursuant to *Abeita,* they would not have been held to support a negligence per se instruction because they simply require the jury to determine whether the defendant acted "reasonably" or "negligently." We adopt *Abeita* as the dominant standard for all future cases, and to the limited extent that *Lozoya* and *Roderick* are inconsistent with *Abeita* they are no longer controlling authority.

 {22} Finally, we take issue with one part of the Court of Appeals opinion. That opinion suggests that if the UBC requires landlords to bring certain safety features up to the standards of a newly adopted version of the UBC, this "would bring the UBC in direct conflict with New Mexico's established standard of ordinary care," which requires a landlord to " 'maintain the common areas of his property in a reasonably safe condition.' " *Heath,* 2007–NMCA–003, ¶ 15, 141 N.M. 131, 151 P.3d 903 (quoting *Calkins v. Cox Estates,* 110 N.M. 59, 64, 792 P.2d 36, 41 (1990)). According to this logic, any statute that pro-

vides a specific standard of care would create an impermissible conflict with the common law standard. However, when a statute, ordinance, or regulatory provision sets forth a standard of care that is different from the common law, that conflict is not fatal to its use as a proper standard for negligence per se. The statutory standard serves to supplement the common law standard, and the jury may be instructed on negligence per se using the statutory standard. *See Sims v. Sims,* 1996–NMSC–078, ¶ 23, 122 N.M. 618, 930 P.2d 153 ("The common law fills in gaps not addressed by a statute."); *Staudinger v. Barrett,* 208 Conn. 94, 544 A.2d 164, 167 (1988) ("The doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care."); *see also Spencer v. Health Force, Inc.,* 2005–NMSC–002, ¶ 20, 137 N.M. 64, 107 P.3d 504 (holding that when a statute sets forth a standard that is impossible to comply with, the common law standard still applies). We reject any implication to the contrary in the opinion of the Court of Appeals.

 {23} In the instant case, if Appendix Chapter 34 had specifically mentioned guardrail spacing, then it is likely that the term "dangerous to life" in the Use of Existing Buildings provision could be construed to adopt by reference a particular guardrail spacing requirement, such that Defendant would have had a duty to bring the spacing into compliance with the latest version of the code. A negligence per se instruction in that situation would have been warranted. However, as it stands, the UBC does not supply a sufficiently specific standard to permit such an instruction. Thus, our holding that negligence per se is not applicable in this case relates to the lack of specificity in the relevant ordinance and code provisions, not to the ultimate permissibility of a standard of care that deviates from the common law.[3]

---

**3.** We also clarify that negligence per se should not be equated with strict liability. The Court of Appeals stated that it saw "no reason to supplant [the] established standard of ordinary care with a standard that renders landlords strictly liable (notwithstanding issues of causation) for any injury suffered by a tenant that might have been prevented by bringing an existing structure into compliance with amendments to the UBC."

*Heath,* 2007–NMCA–003, ¶ 16, 141 N.M. 131, 151 P.3d 903. This statement mistakenly construes the concepts of negligence per se and strict liability as one and the same. *See Lui v. Barnhart,* 987 P.2d 942, 945 (Colo.App.1999) ("[N]egligence per se [is] established by a showing that the defendant's conduct was such that it breached a duty to meet a certain standard of care," whereas "[s]trict liability in tort arises not

## CONCLUSION

{24} We affirm the Court of Appeals and, consequently, the district court's entry of a directed verdict on Plaintiff's negligence per se claim.

{25} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices, and RICHARD E. RANSOM (Pro–Tem).

---

from conduct proscribed or prescribed under a common law or statutory duty of care, but from circumstances that may exist independent of and regardless of the conduct of the tortfeasor."). A defendant can rebut an allegation of negligence per se with proof of an excuse for the violation, a possibility that is not allowed for in strict liability. *See* Restatement (Second) of Torts § 288A.