This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**THOMAS L. STROMEI and STROMEI REALTY, LLC, a New Mexico Limited Liability Company**,

Plaintiffs-Appellees/Cross-Appellants,

v.                                                                              **NO. 30,499**

**RAYELLEN RESOURCES, INC., a New Mexico Corporation, LIONEL BURNS, individually, JANE BURNS, a/k/a JANE McVEY, individually, KENYON BURNS, individually, DESTINY RESOURCES, INC., a New Mexico Corporation, and DESTINY CAPITAL, INC., a New Mexico Corporation,**

Defendants-Appellants/Cross-Appellees.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George P. Eichwald, District Judge**

Stelzner, Winter, Warburton, Flores, Sanchez & Dawes, P.A.
Luis G. Stelzner
Robert P. Warburton
Jaime L. Dawes
Albuquerque, NM

for Appellees

Tucker Law Firm, PC

Steven L. Tucker
Santa Fe, NM

The Simons Firm, LLP
Frank M. Bond
Faith Kalman Reyes
Santa Fe, NM

for Appellants

**MEMORANDUM OPINION**

**VIGIL, Judge.**

**I.      Introduction**

Defendants are Rayellen Resources, Inc.[1] and Lionel Burns, Jane McVey, and Kenyon Burns, individually.  Lionel Burns and Jane McVey were married, and Kenyon Burns is their son.  During the relevant periods to this lawsuit, Lionel Burns and Jane McVey owned Rayellen Resources, Inc. (Rayellen), and Kenyon Burns was involved with the company in various capacities.  Plaintiffs are Stromei Realty, LLC and its co-owners, Thomas L. Stromei (Tom) and Thomas D. Stromei (Tommy).

Rayellen purchased the L-Bar Ranch (L-Bar) in 1989 after Tom Stromei, sub-agent for the seller, contacted Lionel Burns, having been previously involved with real

---

[1]Rayellen was formerly organized as Caprock Pipe and Supply, and was operating under the Caprock name during a portion of the relevant period to this lawsuit.  However, for ease of reference and to avoid confusion, we refer to Caprock as Rayellen throughout the opinion.

2

estate transactions for Rayellen. After Rayellen purchased the L-Bar, Tom Stromei became the ranch manager and worked on the L-Bar for seventeen years. Stromei Realty also brokered many real estate deals for Rayellen during that time period. In 2005, Rayellen listed the L-Bar for sale with Stromei Realty. Stromei Realty located Triple Bar S Ranch (Triple Bar) as a buyer for the L-Bar, and a Purchase and Sale Agreement (PSA) was signed between Triple Bar and Rayellen on December 16, 2005. The parties proceeded towards a closing scheduled for April 20, 2006, but the sale was never completed.

Tom Stromei and Stromei Realty sued Rayellen, Lionel Burns, Jane McVey, and Kenyon Burns for breach of Stromei Realty's exclusive listing agreement on the L-Bar, breach of an oral agreement for a share in the profits of the L-Bar between Tom Stromei and Rayellen, tortious interference with contracts, and breach of the duty of good faith and fair dealing, among other causes of action, relating to the failure of the sale of the L-Bar to Triple Bar. Defendants appeal from a jury verdict awarding $4.5 million to Tom Stromei for breach of an oral agreement under which Tom Stromei was entitled to 25 percent of the net profits from the sale of the L-Bar, and awarding $2.9 million to Stromei Realty for its commission on the exclusive listing agreement. The jury also found that Rayellen breached the duty of good faith and fair

dealing as to both contracts and that each individual Defendant committed tortious interference with contracts.

**II.     Denial of Directed Verdicts**

A directed verdict is a drastic measure that is generally disfavored. *Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 729, 749 P.2d 1105, 1108 (1988).  A trial court should not grant a motion for directed verdict unless it is clear that "the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Id.*  When reviewing a denial of a directed verdict, we view the evidence in the light most favorable to the party opposing the directed verdict, indulging every reasonable inference to support the evidence, and ignoring conflicts in the evidence that are unfavorable to the party opposing the motion.  *See C.E. Alexander & Sons, Inc. v. DEC Int'l, Inc.*, 112 N.M. 89, 93, 811 P.2d 899, 903 (1991).

Defendants argue that the district court erred in denying their motions for a directed verdict on the following issues: (1) Stromei Realty failed to produce a ready, willing, and able buyer; (2) there was no meeting of the minds on the oral contract; and (3) Plaintiffs are not entitled to recover on the oral contract due to the failure of a condition precedent.  Defendants also argue that the district court erred in granting

Plaintiff's motion for directed verdict on the issue of the statute of frauds. We address each in turn.

**A.      Ready, Willing, and Able Buyer**

The district court denied Defendants' motion for a directed verdict on their assertion that Stromei Realty failed to produce a ready, willing, and able buyer. The jury was instructed on producing a ready, willing, and able buyer as follows:

> A real estate broker has earned his agreed commission when he produces a prospect who is ready, willing and able to purchase on terms agreeable to the seller. When seller accepts the prospect produced by the broker as a purchaser, the broker's right to commission becomes fixed. The seller relieves the broker of any further duty when he accepts the purchaser as satisfactory and a binding contract is made. The question of the purchaser's readiness, willingness and ability to buy are factors no longer to be considered once the broker turns over his prospect to the owner, who accepts the prospect as purchaser by entering a binding contract.

The buyer, Triple Bar, was officially recognized as an LLC by the State of Colorado on January 25, 2006, when it filed its articles of organization with the state pursuant to Colorado law. *See* Colo. Rev. Stat. § 7-80-207 (2004). Therefore, the company did not formally exist on December 16, 2005, the date the PSA was signed by Michael Malano, as manager of Triple Bar S, LLC. Further, Triple Bar did not formally exist on the date that the financial assurance letter was prepared pursuant to the PSA, December 27, 2005. Thus, Defendants argue that the PSA was void for impossibility on the grounds that Triple Bar was unable to comply with the condition

5

that required production of written confirmation at closing, and the condition for the financial assurance letter was not satisfied because the letter produced was invalid. On these grounds, Defendants assert that Triple Bar and Rayellen did not enter into a valid, binding contract, and therefore, Stromei Realty failed to produce a ready, willing, and able buyer so as to entitle the company to its commission.

However, sufficient evidence was presented for reasonable minds to differ about whether Stromei Realty produced a ready, willing, and able buyer. The jury was instructed "[u]nless the parties make technical performance a condition of the contract, a failure to perform a contractual obligation, in order to be a breach, must be substantial rather than a minor or technical failure." The jury was further instructed as follows:

> If you find that Triple Bar S was not legally formed as a limited liability company at the time individuals associated with Triple Bar S Ranch signed the Purchase and Sale Agreement, Triple Bar S is nonetheless bound by the terms of the purchase and sale agreement if it expressly or impliedly adopted or ratified the Purchase and Sale Agreement after it was formally organized as a limited liability company. An entity impliedly adopts or ratifies a contract if it receives benefits from such contract, or takes any other action showing an intention to adopt and be bound by the contract.

Substantial evidence supported a finding that Triple Bar ratified the contract after it was formally incorporated on January 25, 2006. This includes its continued communication with sellers through its attorney, the signing of a first amendment to

6

the PSA with Rayellen on April 11, 2006, and filing a lawsuit in federal court for specific performance on the contract on April 21, 2006. Rayellen received a fax from Tom Stromei on April 26, 2006, containing the organizational documents of Triple Bar showing that the company was not formed until January 25, 2006. Therefore, any technical breach that occurred was cured as of January 25, 2006, when Triple Bar incorporated, long before the scheduled closing date or knowledge of the breach by Rayellen.

Furthermore, evidence was presented that Defendants waived the breach under the provisions of the PSA and that the breach was cured. Defendants argue that § 14.3 of the PSA required all waivers to be in writing, and thus, Rayellen did not waive this breach. However, the remedies provision in the PSA required Rayellen to give Triple Bar at least five days to cure any breach, and the breach was cured before Rayellen had notice of the breach. In addition, both parties proceeded in attempting to close the contract after notice, and Rayellen presented no evidence that it took any action to enforce the breach under the remedies provision after it received the organizational documents.

Defendants also argue that the remedies provision was intended only for breaches occurring prior to the first closing, and this breach could have only occurred at the closing, when Triple Bar could not have produced the written confirmation of

7

existence on December 16, 2005. Thus, Defendants argue that the inability of Triple Bar to produce the documentation at closing renders the contract impossible, citing *Sanders v. Freeland*, which states: "Impossible conditions cannot be performed; and if a person contracts to do what at the time is absolutely impossible, the contract will not bind him, because no man can be obligated to perform an impossibility." 64 N.M. 149, 152, 325 P.2d 923, 925 (1958). This asserted impossibility does not alter the fact that Triple Bar cured the breach before the scheduled closing date and before Rayellen knew of the breach. The material contractual condition was satisfied that Triple Bar be a validly existing company authorized to do business in New Mexico at the scheduled closing date. In addition, Plaintiffs' expert testified that when organizational paperwork is not filed before closing, the typical remedy is to get the paperwork filed, not to claim a breach. Thus, although the production of the paperwork evidencing the existence of Triple Bar in December 2005 was impossible, Triple Bar was a validly existing company long before the scheduled closing. This condition did not make performance of the underlying goal of the contract impossible. Instead, it was a breach of a technical term of the contract, and the jury was instructed to determine whether any breaches resulted in the failure of Stromei Realty to produce a ready, willing, and able buyer. Therefore, we conclude that substantial evidence was

introduced upon which reasonable minds could differ about whether the breach was either merely technical, or that it was cured by Triple Bar pursuant to the PSA.

As to the financial assurance letter, Defendants argue that it was invalid, as it stated that the "principals of Triple Bar" had the financial resources to complete the purchase of the L-Bar. Defendants argue that because Triple Bar had not been incorporated as of December 27, 2005, there could be no principals in existence, rendering the letter false and the condition of the PSA unsatisfied.

However, acceptance of the financial assurance under the contract was in Rayellen's absolute discretion: "Buyer shall deliver to Seller written confirmation from a financial institution acceptable to Seller that Buyer has the resources available to satisfy the [closing payment] in a timely manner, the form and substance of such written confirmation being subject to the approval of Seller in its sole and absolute discretion." This provision also granted to Rayellen the option to terminate the agreement in stating, [i]n the event Seller is not satisfied with the information contained in such written confirmation, Seller may deliver written notice of termination within ten (10) Business Days of the Opening of Escrow, in which case this Agreement shall be null and void and of no force and effect."

Rayellen did not terminate the agreement after receipt of the financial assurance letter and testimony was introduced that Rayellen was satisfied with the letter after its

proposed changes were made. Rayellen continued towards closing the transaction after receipt of the letter, effectuating the provision of the financial assurance clause stating, "[i]n the event Seller does not provide to Buyer such written notice of termination within such ten (10) Business Day period, Seller shall be deemed to have approved of Buyer's written confirmation of its financial resources and the parties shall proceed with this Agreement." Furthermore, Plaintiffs' expert testified that even if the letter was false, Rayellen still accepted the letter in satisfaction of § 3.1.1 and Triple Bar as ready, willing, and able buyers. In addition, testimony was introduced that Rayellen could have structured the transaction to require financial assurance from Triple Bar before the PSA was signed, that the corporation's attorney asked if Lionel Burns wanted additional financial information from Triple Bar, and that Rayellen requested no further financial information. Thus, substantial evidence was presented from which the jury could infer that any purported failure of the financial assurance letter did not affect Stromei Realty's production of a ready, willing, and able buyer.

Additionally, Plaintiffs' expert testified that Stromei Realty produced a ready, willing, and able buyer when the conditional provisions of the PSA were fulfilled: acceptance of the financial assurance letter and expiration of the due diligence period. Plaintiffs' expert testified that the latest date these conditions could have been satisfied was at the signing of the first amendment to the purchase agreement, April

11, 2006, and he therefore determined that Stromei Realty had produced a ready, willing, and able buyer as of that date. Accordingly, to the extent Appellants argue that breaches to the PSA occurring after April 11, 2006, affected Stromei Realty's production of a ready, willing, and able buyer, we conclude that substantial evidence was presented from which the jury could have inferred that Stromei Realty had already produced a ready, willing, and able buyer as of that date, and any subsequent actions taken by either party no longer affected Stromei Realty's right to the commission.

Finally, with regard to Defendant's arguments regarding alleged misrepresentations by Tom Stromei, we conclude that sufficient evidence was presented for the jury to find that he fully disclosed all information to Rayellen and was entitled to his commission. *See Canfield v. With*, 35 N.M. 420, 426, 299 P. 351, 353 (1931) (stating that the jury could consider the broker's knowing false misrepresentations to his client to induce him to enter the transaction in determining if he was entitled to a commission on the sale). Tom Stromei sent the organizational documents that stated that Triple Bar was not formed until January 25, 2006, to Kenyon Burns with his fax that purportedly misrepresented the formation date of the company. In addition, any statements Tom Stromei made regarding the buyers being "stout" were explained by Tom Stromei to refer to Malano's physique as an ex-

11

football player. Furthermore, he testified that he disclosed the information immediately when he learned that Pacheco was involved with Triple Bar, as Pacheco had been involved in an earlier offer on the L-Bar. Resolving conflicting evidence in favor of denying the motion, reasonable minds could differ as to whether misrepresentations were made by Tom Stromei, and the motion for directed verdict was properly denied as to this issue.

**B.      Meeting of the Minds**

Defendants argue that because of a disagreement between Plaintiffs and Defendants as to whether interest was to be included on Rayellen's expenditures and how to calculate the interest, the parties did not come to a meeting of the minds as to a material term of the oral agreement as a matter of law. At trial, the jury was instructed,

> [a] contract is a legally enforceable set of promises. In order for a set of promises to be legally enforceable, there must be an offer, an acceptance, consideration, and mutual assent. Any of these four requirements, although not expressly stated, may be found in the surrounding circumstances, including the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal or would deal.

An additional instruction was given that stated, "[f]or there to be a mutual assent, the parties must have had the same understanding of the material terms of the agreement."

12

The jury found that interest was a component of Lionel Burns and Tom Stromei's oral agreement and calculated it at the prime rate, compounded annually.

Defendants argue that because Defendants contended at trial that interest was a part of the agreement, and Plaintiffs contended that it was not, that a directed verdict should have been granted because no reasonable minds could differ as to the absence of mutual assent to a material term of the agreement.

However, substantial evidence was presented from which the jury could determine that the parties came to a meeting of the minds on interest when they made the original agreement, despite their disagreement at trial regarding the term. Multiple exhibits were introduced by Defendants in which Tom Stromei had included interest in the calculation of his net profit, and two where he had classified that interest as being "reasonable interest." Tom Stromei stated at trial that interest was not a term of the agreement, but exhibits were presented to the jury to contradict that statement. Lionel Burns testified that he agreed that "reasonable interest" was a term of the agreement, and several defense witnesses stated that they thought that the purported agreement to deduct "costs of all kinds" from the gross profit would include interest as a cost. Bill Dillard, an original partner with Lionel Burns in the L-Bar, stated that he thought interest was a component of Lionel Burns and Tom Stromei's agreement. Tommy Stromei testified that he and Lionel Burns entered into an agreement similar

to one Lionel Burns had with Tom Stromei, and Lionel Burns required that interest be a component of that agreement, calculated at the prime rate, but not compounded.

In addition, three drafts were presented at trial that Lionel Burns directed his attorney to prepare to memorialize Lionel Burns' and Tom Stromei's oral agreement, and all included interest calculated at the prime rate, with two annually compounding the interest. Jimmy Waechter, Lionel Burns' accountant, testified that he included interest in the calculations of Tom Stromei's share because he thought that Lionel Burns would want it to be included in the same manner as it was included in the profit sharing agreement with Tommy Stromei. Furthermore, Jimmy Waechter applied a prime rate, compounded annually, and testified he did so because that is what he thought the reasonable interest rate would be, and figured that Rayellen would give Tom Stromei the best interest rate possible under the agreement. Furthermore, despite Defendants' argument on appeal that no mutual assent was reached as to interest or the rate at which it would be calculated, Defendants argued in closing argument that the parties had agreed on a reasonable interest rate, and the most reasonable interpretation of that rate was that it should be calculated at the prime rate, compounded annually.

Thus, sufficient evidence was presented for reasonable minds to differ as to whether there was a meeting of the minds regarding interest. Rule 11-606 NMRA

14

precludes consideration of Defendants' argument that the spontaneous statement made by a juror after the verdict, is evidence that reasonable minds could not conclude that the parties had a meeting of the minds on the calculation of interest. *See Shadoan v. Cities of Gold Casino*, 2010-NMCA-002, ¶ 13, 147 N.M. 444, 224 P.3d 671 (determining that in a motion for new trial, it was error to consider affidavits of jurors stating the amount they intended to award the plaintiff, stating "[t]o hold otherwise would make deliberations reviewable, and the final authority of a verdict would not be by jury, but by a reviewing court").

## C.     Failure of a Condition Precedent

Defendants argue that a directed verdict should have been granted that Tom Stromei was not entitled to recover on the oral profit sharing agreement because of the failure of a condition precedent, the sale of the L-Bar. We disagree.

The jury was instructed: "Where a party to a contract prevents the fulfillment of condition precedent to its performance under the contract, that party cannot rely on such a condition precedent to defeat its liability under the contract." Substantial evidence was introduced that Rayellen prevented the sale of the L-Bar. Evidence demonstrated that the board of directors of Rayellen was involved in conflict, including a divorce, dissension regarding the leadership of the company, and Lionel Burns admitted that he refused to work with the other directors of the board because

15

they were not communicating with him. At the time of the closing, the title insurer for the transaction sent an e-mail to the parties stating that it could not insure or close the sale based on an inability to determine who had authority to sign for Rayellen. Triple Bar instituted a federal lawsuit for specific performance based on this confusion on April 21, 2006. Although evidence was also presented at trial that Triple Bar was an alternative cause for the failure to complete the sale, substantial evidence was presented from which the jury could find that Rayellen prevented the fulfillment of the sale and, therefore, that the condition precedent was excused.

In addition, the jury was instructed:

> If you find that Rayellen breached or unequivocally demonstrated an intent to not perform its obligations under its contracts with Mr. Stromei or Stromei Realty, LLC, then all remaining duties Mr. Stromei or Stromei Realty, LLC had under their contracts were discharged. Once Rayellen breached or repudiated its contractual obligations, Mr. Stromei and Stromei Realty, LLC became entitled to recover for breach of contract, regardless of whether they performed any remaining duties under the contract.

Another instruction stated that "[a]n entity may breach a contract by failing to perform a contractual obligation when that performance is called for or announcing ahead of time that it will not perform a contractual obligation when the time for that performance comes due." Another instruction stated, "It is a breach of contract if, before performance became due, Rayellen announced or otherwise demonstrated its intention not to perform a contractual obligation."

16

Evidence was presented at trial that Lionel Burns sent Tom Stromei a letter on April 14, 2006, purportedly withdrawing any offer he had made Tom Stromei about deferred compensation. Further evidence was submitted that Jane McVey stated that she would not honor any agreement that Lionel Burns had made with Tom Stromei. The jury was instructed: "A corporation can act only through its officers and employees. Any act or omission of an officer or an employee of a corporation, within the scope or course of his or her employment, is the act or omission of the corporation."

This constituted additional sufficient evidence to allow reasonable minds to find that the parties in control of Rayellen unequivocally demonstrated an intent not to honor its contracts with Tom Stromei, thus entitling Tom Stromei to recover for breach of the net profit sharing agreement, and for Stromei Realty to recover the listing agreement in spite of the failure of the sale of the L-Bar.

**D.    Statute of Frauds**

The district court granted a directed verdict on Defendants' statute of frauds defense to the oral agreement. *See Lightsey v. Marshall*, 1999-NMCA-147, ¶ 16, 128 N.M. 353, 992 P.2d 904 ("The statute of frauds requires that an action brought on a contract concerning an interest in land be based upon an agreement in writing signed by the party to be charged or one authorized by the party to be charged."). Generally,

17

the applicability of the statute of frauds is a question of law for the court; however, "a factual question concerning the particulars of a contract may prevent a ruling on the statute's applicability as a matter of law." *Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 24, 766 P.2d 280, 284 (1988).

To support a statute of frauds defense, Defendants were required to present evidence that the parties had a meeting of the minds that Tom Stromei was entitled to an interest in land rather than net profits. We agree that no testimony or evidence was presented upon which reasonable minds could differ regarding this issue.

Defendants assert that Plaintiffs' filing of lis pendens on the L-Bar in this lawsuit, assertions in the complaint for an equity share in the land and real estate, and Tom Stromei's documents stating they he had an "equity sharing agreement" with Rayellen are evidence that Tom Stromei claimed an interest in land. However, despite these actions, no evidence was presented at trial that Lionel Burns and Tom Stromei came to a meeting of the minds for an interest in land under the oral contract. Moreover, testimony by Lionel Burns and others that the original agreement was for net profits was undisputed. Mere assertions in the complaint and documents do not establish that a meeting of the minds occurred in the face of the undisputed testimony by Lionel Burns and Tom Stromei that they never agreed Tom Stromei would have an interest in land. Lionel Burns stated that initially Tom Stromei had asked to be 50

percent owner in the ranch, but Lionel Burns only agreed that Tom Stromei that would receive "10 % of the net profit." Tom Stromei, likewise, stated in his testimony that the oral agreement was for net profits. Lionel Burns also said that Tom Stromei does not and has never had any ownership interest in the L-Bar, and Rayellen retained complete control over the L-Bar. Tom Stromei stated in testimony and draft agreements that Rayellen maintained control of all rights regarding decisions to convey the property, and it was undisputed that Tom Stromei never took any title to the property nor received any tax documents regarding an ownership in the property.

Testimony was presented at trial regarding Tom Stromei's attempts to obtain a property interest in the L-Bar for capital gains treatment on his profit share, but it was undisputed that Lionel Burns and his accountant and lawyers told Tom Stromei that it was not possible, and thus no evidence was presented indicating a meeting of the minds for an interest in land. Kenyon Burns testified that Tom Stromei told him the original agreement was for an interest in land, but explained that this was because Tom Stromei was trying to get capital gains treatment on his profit share. Tom Stromei added that the equity he was referring to in regard to the oral agreement was the amount of money invested in the property over what was owed, and not to an interest in land.

19

For the foregoing reasons, we conclude that the district court did not err in ordering a directed verdict on Defendants' statute of frauds defense.

## III. Admission of Extra-Marital Affairs

Defendants argue that the district court erred in introducing two exhibits and allowing testimony about Lionel Burns' marital infidelity. The admission of evidence is reviewed for an abuse of discretion and will not be overturned absent a clear abuse of that discretion. *Nelson v. Homier Distrib. Co.*, 2009-NMCA-125, ¶ 29, 147 N.M. 318, 222 P.3d 690.

Two exhibits were admitted referencing Lionel Burns' affairs: A handwritten agreement signed by Lionel Burns promising to not be involved with other women and allowing Jane McVey three-quarters of the marital assets if he broke that promise, and Jane McVey's petition for dissolution of marriage, citing Lionel Burns' infidelity and her claim to three-quarters of the marital assets based on the handwritten agreement. Defendants argue that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice to Lionel Burns and improper use of the evidence by the jury.

The relevance of the testimony and exhibits concerned the potential motives of Defendants behind the breakdown among the board members of Rayellen at the time of the Triple Bar transaction. Defendants argued that all that was necessary to achieve

20

that purpose was to inform the jury that Lionel Burns and Jane McVey were undergoing a divorce, citing decisions that have limited this type of evidence. However, the mere fact that a divorce was occurring did not evidence the circumstance of Jane McVey claiming three-quarters of the marital assets under an agreement with Lionel Burns, or give context to the emotional events underlying the divorce, distinguishing this case from *Bourgeous*, where the additional facts did not increase the probative value of the evidence. *See Bourgeous v. Horizon Healthcare Corp.*, 117 N.M. 434, 440, 872 P.2d 852, 858 (1994). Furthermore, the district court issued a limiting instruction and cautioned the attorneys from going into any details of the affairs and required the attorneys to refer to "inappropriate conduct," rather than using the term "extramarital affairs."

Under the circumstances, we cannot say the district court abused its discretion in admitting this evidence.

**IV.    The Special Verdict Form**

The jury found that Rayellen breached the implied duty of good faith and fair dealing as to both the listing agreement and the oral agreement and that each of the three individual defendants tortiously interfered with contract. However, the special verdict form did not require the jury to specifically allocate damages based on these determinations. Thus, Defendants argue that the judgment cannot stand on either the

award for tortious interference with contracts, or a breach of the duty of good faith and fair dealing, as the jury awarded no damages on those claims.

As an initial matter, we observe that Defendants failed to preserve this argument. Rule 1-051 NMRA requires that a party object to errors in jury instructions. Rule 1-051(I). Defendants assert that the tender of an alternative special verdict form, which was structured to allow the jury to award damages in the same section as the determination of liability was sufficient to preserve this error even though they failed to apprise the district court of the argument they now make on appeal. Simply tendering an alternative jury instruction is not sufficient to preserve an error without some indication to the court of the alleged error. *Heath v. La Mariana Apartments*, 2007-NMCA-003, ¶ 26, 141 N.M. 131, 151 P.3d 903 ("To preserve an issue for appellate review, the objection must be specific enough to alert the district court to the particular vice in the defective instruction." (internal quotation marks and citation omitted)), *aff'd on other grounds by* 2008-NMSC-017, ¶¶ 1, 24, 143 N.M. 657, 180 P.3d 664; *City of Albuquerque v. Ackerman*, 82 N.M. 360, 364, 482 P.2d 63, 67 (1971) (same).

Alternatively, Defendants argue that this is an issue for fundamental error review, on the grounds that there is "a total absence of anything in the record showing a right to relief." *See Chavez v. Bd. of Cnty. Comm'rs*, 2001-NMCA-065, ¶ 41, 130

N.M. 753, 31 P.3d 1027 ("[Fundamental error] applies only in exceptional circumstances, such as when substantial justice was not done, the court was deprived of jurisdiction to hear the case, the issue was one of general public interest that would impact a large number of litigants, or, there was a total absence of anything in the record of the case showing a right to relief." (internal quotation marks and citation omitted)). We disagree that this issue warrants review as fundamental error. The jury awarded damages predicated on its findings that Defendants breached the oral agreement, the listing agreement, breached the duty of good faith and fair dealing as to both contracts, and tortiously interfered with contract. Further, even if Defendants had preserved this issue or it was a matter of fundamental error, reversal is not warranted. *See McNeill v. Burlington Res. Oil & Gas Co.*, 2007-NMCA-024, ¶ 19, 141 N.M. 212, 153 P.3d 46 ("A civil case will not be reversed due to error in jury instructions unless the result is fundamentally unjust."), *aff'd on other grounds by* 2008-NMSC-022, ¶ 30, 143 N.M. 740, 182 P.3d 121. The jury undisputedly found breaches of both contracts, breaches of the duty of good faith and fair dealing to both contracts, tortious interference with contract, and awarded compensatory damages as to both contracts. Furthermore, the jury was instructed to allocate damages against the individual Defendants based upon its finding of tortious interference with contracts, and this was the only cause of action the jury found upon which the

damages against the individual Defendants could be based. As to the breach of the duty of good faith and fair dealing, the lack of specification of the damages awarded based on each cause of action does not invalidate the jury's explicit findings. Defendants do not challenge the findings of the jury as erroneous, thus, it is immaterial for the purposes of upholding the judgments that there be a specific allocation of damages to the breaches of the duty of good faith and fair dealing. *See H.T. Coker Constr. Co. v. Whitfield Transp., Inc.*, 85 N.M. 802, 805, 518 P.2d 782, 785 (Ct. App. 1974) (determining that even if evidence was insufficient to support a finding of the court, the finding was unnecessary to uphold the judgment because other findings supported the judgment). We decline to reverse the judgments on these grounds.

**V.     Post-Judgment Interest**

NMSA 1978, § 56-8-4(A)(2) (2004), provides that post-judgment interest applies to all judgments, calculated at 8.75 percent unless the judgment is based on "tortious conduct, bad faith or intentional or willful acts," in which case, interest shall be computed at 15 percent. The district court awarded 15 percent interest on the 2.9 million dollar judgment against all Defendants based on the breach of the listing agreement with Stromei Realty, and 8.75 percent on the 4.5 million judgment against all Defendants based on the breach of the net profits agreement with Tom Stromei.

24

Defendants contend that post-judgment interest should have been assessed at 8.75 percent on the entire judgment, as the jury assessed no damages in the special verdict form to any "tortious conduct, bad faith or intentional or willful acts." Plaintiffs cross-appeal, arguing that post-judgment interest should be assessed at 15 percent on the entire judgment, as the compensatory damages were premised on the jury's findings of Rayellen's intentional conduct in breaching the duty of good faith and fair dealing and the individual Defendants' tortious interference with contracts.

The special verdict form instructed the jury if they found either a breach of contract and/or a breach of the duty of good faith and fair dealing to determine one amount of compensatory damages in Part "A" for the oral agreement, and one amount in Part "B" for the listing agreement. The special verdict form instructed the jury, "[i]f you answered "Yes" to Interrogatory Number 8 [tortious interference] . . . you may allocate compensatory damages due to Tom L. Stromei determined in Part "A" and the compensatory damages due to Stromei Realty determined in Part "B" among the responsible individual defendants and Rayellen."

The jury found that Rayellen breached the oral contract and that Rayellen was liable to Stromei Realty for the commission on the listing agreement as well. Moreover, the jury also found that Rayellen acted intentionally, and thereby breached the duty of good faith and fair dealing with respect to both contracts. Thus, all

damages assessed against Rayellen were premised upon a finding of Rayellen's intentional conduct in breaching the duty of good faith and fair dealing in regard to both contracts.

With respect to the individual Defendants, the only theory of liability upon which the jury could have awarded damages was based upon tortious interference with contract. The jury found that Lionel Burns, Jane McVey, and Kenyon Burns tortiously interfered with the performance of the PSA between Rayellen and Triple Bar. The jury allocated damages under Part "A" and under Part "B" to each individual Defendant, and the only liability assessed against the individual defendants was on the basis of tortious interference with contract. Thus, any damages against the individual Defendants were necessarily based upon the jury's finding of tortious interference with contract.

All judgments against Rayellen and the individual defendants were premised upon findings of tortious interference with contracts or intentional conduct in breaching the duty of good faith and fair dealing. The 15 percent interest rate is mandatory where a judgment is based on tortious conduct or intentional acts. *See* § 56-8-4(A)(2). Thus, the district court erred in awarding an 8.75 percent interest rate to 39 percent of the judgment and should have awarded 15% on the entire judgment. We therefore reverse.

## VI.    Pre-Judgment Interest

The court also has discretion to award pre-judgment "interest of up to ten percent from the date the complaint is served upon the defendant after considering, among other things:  (1) if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and (2) if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff."  § 56-8-4(B).  The district court stated on the record its determination that Plaintiffs were not the cause of unreasonable delay, that the case was tried fairly quickly under the circumstances, and that Defendants did not make timely and reasonable settlement offers.  Therefore, the district court awarded interest at a rate of 7 percent from the date that the complaint was served on Defendants.

Defendants argue that the district court abused its discretion in awarding pre-judgment interest on the grounds that they made reasonable and timely offers of settlement, and the court had no way of determining the date at which to calculate the pre-judgment interest because the date of the breaches of contract were unclear.  Defendants further argue that the court made no findings of fact supporting its determination to award pre-judgment interest, and that this award is inconsistent with the court's findings of fact in its refusal to award attorney fees.  Finally, Defendants argue that because the settlement offer made eleven days before trial would be

considered timely under Rule 1-068 NMRA, that it should also be considered timely here.

The findings of fact Defendants assert are inconsistent with the district court's pre-judgment interest determination were based on Plaintiffs' request for attorney fees premised on the allegation that Defendants engaged in vexatious litigation, invoking a different standard and policy than the considerations required under § 56-8-4. *See State ex rel. N.M. State Hwy. Dep't v. Baca*, 120 N.M. 1, 8, 896 P.2d 1148, 1155 (1995) (determining that the district court may award attorney fees for bad faith and vexatious litigation provided that the award is supported by sufficient findings in an order that is intended and reasonably designed to regulate the court's docket, promote judicial efficiency, and deter frivolous findings). Further, the findings of fact in the order denying attorney fees state: "Issues related to offers of settlement and their acceptance are not relevant to the Court's assessment of whether to award attorneys' fees under the [standard for bad faith or vexatious behavior, and n]o settlement offers were ever before the Court prior to trial . . . ., [and t]here is no legal authority in New Mexico to support plaintiffs' contention that failure to settle a case is the equivalent of bad faith required to allow an award of attorneys' fees." Thus, it is clear that the court did not make a determination that Defendants had made "reasonable and timely"

28

settlement offers so as to render its decision to award pre-judgment interest inconsistent with this order.

In further support of their argument, Defendants point to the district court's determination that they engaged in settlement negotiations in good faith, their initial offer to settle with Plaintiffs for $5 million dollars before the complaint was filed by Plaintiffs, and their offer to settle eleven days before trial as evidence of reasonable and timely settlement offers. In spite of Defendants' offers of settlement, we cannot conclude that the court abused its discretion in awarding pre-judgment interest under these circumstances. Defendants cite no authority for the proposition that findings of fact regarding attorney fees under a vexatious litigation standard or the standards under Rule 1-068 are equally applicable to a determination of pre-judgment interest under § 56-8-4(B). Further, the court had discretion to consider, among other things, any settlement efforts made by Defendants and the Plaintiffs' role in expeditiously trying the case and did so on the record. *See* § 56-8-4(B). Although Defendants made settlement offers, the court had discretion to determine that they were not reasonable or timely. The court's discretion is supported by the fact that both offers were less than Plaintiffs' recovery at trial, and one was made just eleven days before a complex and lengthy trial. *Id.*

As to Defendants' argument that the court could not ascertain the date of the breach to determine when pre-judgment interest commenced, we point to the language in the statute that provides for assessment as of the date of service of the complaint, which is the date the court directed from which the interest should be calculated. *See* § 56-8-4(B) (stating that "the court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant"). Furthermore, the district court, after considering the statutory requirements, awarded pre-judgment interest at 7 percent, a lower rate than the 10 percent allowed under the statute. *See* § 56-8-4(B). The district court's award cannot be said to be "clearly against the logic and effect of the facts and circumstances before the court." *See City of Santa Fe v. Komis*, 114 N.M. 659, 663, 845 P.2d 753, 757 (1992). We therefore conclude that the district judge did not abuse its discretion, and affirm the award of pre-judgment interest.

**VII.  Conclusion**

We reverse the district court's post-judgment interest ruling, and remand for entry of an amended judgment consistent with this opinion. We affirm the district court as to all other issues raised on appeal.

**IT IS SO ORDERED.**

_____

**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**


_____

**CELIA FOY CASTILLO, Chief Judge**



_____

**CYNTHIA A. FRY, Judge**